# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| THE CAPTURE ELEVEN GROUP<br>a California corporation<br><br>               Plaintiff,<br>    vs.<br><br>OTTER PRODUCTS, LLC,<br>a Colorado limited liability company, and<br>TREEFROG DEVELOMENTS, INC., a<br>Delaware corporation<br><br>             Defendants. | Case No. 20-cv-2551<br><br>**EXPERT REPORT OF**<br>**PROFESSOR**<br>**ROBERT ZEITHAMMER** |

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

# TABLE OF CONTENTS

I.     Qualifications ....................................................................................................... 4

II.    Assignment ......................................................................................................... 5

III.   Background ......................................................................................................... 5

    A.   Summary of dispute ...................................................................................... 5

    B.   Images at Issue ............................................................................................. 7

    C.   Products at Issue ........................................................................................... 7

    D.   Relevant Period and Claims ....................................................................... 10

IV.    Summary of Opinions ....................................................................................... 11

V.     Methodology: Survey Administration and Subject Selection ............................. 12

VI.    Methodology: Survey Design ............................................................................ 15

    A.   Overview of Best Worst Scaling ................................................................. 15

    B.   Application of Best Worst Scaling to Measure the Stated Preferences of Consumers for Features of Phone Cases ....................................................................... 16

    C.   Overview Of Conjoint Analysis .................................................................. 18

    D.   Six Core Requirements For Designing An Accurate Conjoint Analysis Survey and Using the Results to Calculate Incremental Sales ............................................... 21

    E.   Application of Conjoint Analysis to Measure Incremental Sales of Phone Cases due to the Images at Issue .......................................................................................... 24

VII.   Results: ImporTance of Package Attractiveness to Consumers ........................ 39

VIII.  Results: Incremental Sales Due to Images at Issue Based on Full Dataset and Estimated Model   42

IX.    Results: DIRECTION OF Incremental Sales Due to Images at Issue Based on Model-Free Measurements ..................................................................................................... 51

X.     Results: Side-by-Side Direct Comparison of Images in Terms of Liking ........... 53

XI.    Results: Investigation of a potential indirect effect via Online Informational Imagery .... 54

XII.   Corroborating evidence from the record .......................................................... 55

XIII.  Summary of Results ......................................................................................... 56

XIV.   Conclusion ....................................................................................................... 57

Exhibit 1: introducing features for best-worst survey ............................................. 60

    Drop protection ............................................................................................. 60

    Waterproof .................................................................................................... 60

    Dirt protection ............................................................................................... 61

    Durable ......................................................................................................... 61

    Stylish ........................................................................................................... 62

    Good brand .................................................................................................... 62

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

Thin ............................................................................................................................ 63

Attractive packaging box ........................................................................................... 63

Sturdy packaging box ................................................................................................. 64

Affordable .................................................................................................................. 64

Colorful ...................................................................................................................... 65

Innovative .................................................................................................................. 65

High quality ............................................................................................................... 66

Exhibit 2: sample best-worst scaling task ..................................................................... 67

Exhibit 3: Actual package designs ................................................................................ 68

Exhibit 4a: counter-factual package designs ................................................................. 69

Exhibit 4B: actual package design without images ....................................................... 70

Exhbit 5: attribute introduction page ............................................................................ 71

Exhibit 6: sample conjoint task .................................................................................... 72

Exhibit 7: online informational image, actual ............................................................... 73

Exhibit 8: online informational image, counter-factual ................................................. 74

Exhibit 9: Purchase Intent question .............................................................................. 75

Exhibit 10: direct side-by-side package liking question ................................................. 76

Exhibit 11: NEXT package next to FRE package ........................................................... 77

Appendix 1: Curriculum vitae (includes list of publications and testimony) ................... 78

Appendix 2: List of materials reviewed ......................................................................... 79

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

## I.      QUALIFICATIONS

1.      I am a Professor of Marketing in the Anderson School of Management at the University of California, Los Angeles (UCLA). Prior to UCLA, I was an Assistant Professor of Marketing in the University of Chicago Graduate School of Business.

2.      I have a Ph.D. in Management Science from the Massachusetts Institute of Technology and an M.A. in Mathematics and B.A. in Economics and Mathematics from the University of Pennsylvania.

3.      I have authored or coauthored more than 20 peer-reviewed scientific articles in management science and quantitative marketing journals, including *Management Science*, *Marketing Science*, *Journal of Marketing Research and Quantitative Marketing and Economics*. I am an associate editor of *Management Science* and *Quantitative Marketing and Economics* and a member of the editorial board of *Journal of Marketing Research*. I have participated and/or delivered presentations in numerous academic conferences on quantitative marketing, and I have been invited to present my research in dozens of university departments. In my research, I have both helped develop and extensively used the quantitative marketing methods used in this report: conjoint analysis surveys and models of consumer choice.[1]

4.      For the last 19 years, I have taught both general marketing and specific marketing science techniques such as conjoint analysis and choice modeling to hundreds of MBA students at University of Chicago, University of California, and Hong Kong University of Science and Technology.

---

[1] For example, Shu, S. B., Zeithammer, R., & Payne, J. W. (2018). The Pivotal Role of Fairness: Which Consumers Like Annuities? *Financial Planning Review*, 1(3-4), e1019; Shu, S. B., Zeithammer, R., & Payne, J. W. (2016). Consumer Preferences for Annuity Attributes: Beyond Net Present Value. *Journal of Marketing Research*, 53(2), 240–262; Zeithammer, R., & Kellogg, R. P. (2013). The Hesitant Hai Gui: Return-Migration Preferences of U.S.-Educated Chinese Scientists and Engineers. *Journal of Marketing Research*, 50(5), 644–663; Zeithammer, R., & Lenk, P. (2009). Statistical Benefits of Choices from Subsets. *Journal of Marketing Research*, 46(6), 816–831; Zeithammer, R., & Lenk, P. (2006). Bayesian Estimation of Multivariate-Normal Models When Dimensions Are Absent. *Quantitative Marketing and Economics*, 4(3), 241–265.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

5.      A copy of my Curriculum Vitae is attached as **Appendix 1**, and it includes all of my publications as well as a list of my testimony in the prior 4 years. A list of Materials Reviewed is attached as **Appendix 2**, in addition to the citations in this report. I am being compensated at my standard rate of $900.00 an hour.

## II.      ASSIGNMENT

6.      Counsel for Otter Products, LLC ("Otter") has asked me to attribute the incremental sales, if any, of LifeProof phone cases under plaintiff's claims.

7.      Specifically, counsel for Otter has asked me to attribute the incremental sales of Products at Issue, if any, due to the use of certain photographs taken by Justin L'Heureux and used on packaging for Otter's LifeProof brand protective cases.

## III.      BACKGROUND

### A.  Summary of dispute

8.      This summary of the dispute is based on discussions with counsel for Otter, discussions with Otter employees, as well as my interpretation – as a professor of marketing, not a lawyer – of the operative complaint.[2]

9.      My understanding is that there is a copyright infringement dispute between the photographer L'Heureux behind the Capture Eleven Group that now asserts ownership of some of the images made by Justin L'Heureux ("L'Heureux"), and Otter Products – current owner of the LifeProof brand.[3] The allegation I evaluate in this report is that Otter used some of the images ("Images at Issue" detailed below) on some past LifeProof product ("Products at Issue" detailed below) packaging outside of the asserted scope of the agreement between L'Heureux and Otter.

---

[2] First Amended Complaint, dated October 27, 2020 ("Complaint").
[3] Dkt. 101-3; OP0011073.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

10.      Regarding the mechanism by which the Images at Issue are alleged to operate, I understand from Plaintiff's Amended Complaint that it believes the use of active lifestyle imagery was central to the appeal of the accused LifeProof products.  For example, Plaintiff alleged in its Amended Complaint that "Otter and [TreeFrog] were desirous of selling LifeProof phone cases at premium prices and targeting consumers who either have active lifestyles and would benefit from durable cases, or who associated themselves with the active lifestyle or active lifestyle demographic."[4]  In the Complaint, Plaintiff asserted that it was the consistent "look and feel" of L'Heureux's photographs that drove the purchase decisions of consumers.[5]

11.      My survey-respondent sampling design reflects Plaintiff's assertion and conforms to my understanding of LifeProof's target segment by only admitting respondents who identify with an active lifestyle by selecting "outdoor recreation" or "active sports" as one of their favorite weekend activities.

12.      By focusing only on these key target segments, my respondent-selection criterion is a conservative assumption regarding the magnitude of the effects of Image at Issue on demand by average consumers of phone cases. That is, individuals that have or associate with an active lifestyle would be most likely to respond positively to images of runners, cyclists, dirtbikers, etc. on Otter's product packaging, resulting in an oversized impact of those images.  As discussed in greater detail herein, it is my opinion that the phone-case market as a whole (i.e., including purchasers who do not associate themselves with an "active lifestyle") would demonstrate equal or lesser sensitivity to the Images at Issue, such that any impact of the Images at Issue simulated by my models is the maximum impact.

---

[4] Complaint, at ¶ 11.
[5] For example, Complaint, at ¶¶ 69, 71.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

### B.  Images at Issue

13.    The Amended Complaint filed 10/27/2020 lists seven photographs that appeared on various packaging of LifeProof phone cases:

   i.    Registered photograph #1 (Dirtbike) on LifeProof FRE packages

   ii.    Registered photograph #5 (Wakeboarder) on other LifeProof FRE package

   iii.    Registered photograph #96 (Running woman) on LifeProof SLAM packages

   iv.    Registered photograph #66 (Skateboarder) on LifeProof SLAM packages

   v.    Registered photograph #46 (Gazing girl) on LifeProof NUUD packages

   vi.    Registered photograph #59 (Wall-leaping men) appearing in the background on various packages

   vii.    Registered photograph #81 (Bikerider) appearing in the background on various packages

### C.  Products at Issue

14.    Most of the accused packaging designs use Images at Issue as a dominant image, either as the only image on the front of the packaging or as an image significantly larger than other images and graphical elements.  However, some packaging designs use Images at Issue as subordinate images, as a background graphical element appreciably smaller than another dominant image or than a graphic of the product itself.

15.    In order to model the impact of the Images at Issue across all the packaging styles at issue, I have included two different packages in my surveys.  The first, referred to as the "LifeProof SLAM" package, contains both a dominant [blue annotations] and subordinate Image [purple annotation] Images at Issue. In my survey design, I replace both of the Images at Issue on the LifeProof SLAM package with alternatives. The second, referred to as the "LifeProof FRE" package in this report, contains only a subordinate Image at Issue [purple annotation]. In my survey design, I replace only the subordinate Image at Issue on the LifeProof FRE package with an alternative. In the case

of the FRE product, I also rely on another alternative package with no images at all (explained in detail later in the report).



| LifeProof SLAM Actual | LifeProof SLAM Alternative |
|---|---|

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

| LifeProof FRE Actual | LifeProof FRE Alternative |
|---|---|



EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

16.     In any deployment of packaging or marketing collateral, a company would refine and adjust images or graphical treatments. This is consistent with Otter's business practices in the record.[6]  Since I do not perform such an optimization at all for LifeProof SLAM (I only rely on one alternative design) and I perform only a very limited such optimization for the LifeProof FRE (I rely on two alternative designs), the results of my surveys represent an upper bound on the maximum impact of the Images at Issue.  In other words: whatever positive effect of the Images at Issue I find relative to my alternative designs would be reduced in the real world by additional packaging development and testing of the additional alternative designs by a company like Otter.

### D.  Relevant Period and Claims

17.     The period relevant to the dispute concerns photographs captured by L'Heureux and delivered to Otter between May 2016 to May 2018 and used on LifeProof packaging released in 2017 and 2018.[7]

18.     The plaintiff's claim is that the specific Images at Issue used on the packaging of Products at Issue have increased sales of the Product at Issue.

19.     I am a professor of marketing, not an attorney or a technical expert or industry expert. I do not express any legal opinion on copyright or other areas of the law, nor any technical or industry opinion on photography, packaging, or phone cases. In pursuing my assignment, I assume that the trier of fact will find that all Images at Issue infringed on Capture Eleven Group's copyright for asserted unauthorized uses.

---

[6] For example, The January 2019 Report "LifeProof Packaging Eval. Report" by Robert Goldberg (OP0004561) reports on extensive and iterative testing of three alternative packaging designs for LifeProof FRE.
[7] See Dkt. 101-40, at ¶¶ 4-5.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

## IV.    SUMMARY OF OPINIONS

20.    Using data from two state-of-the-art consumer surveys involving over 1600 vetted respondents, I conducted five distinct analyses to fulfill my assignment. All the analyses agree with each other that the Images at Issue have very little effect on sales, if any, and in most analyses show no statistically significant effect.

21.    The definitive, most rigorous and reliable analysis is the volume-weighted simulation using conjoint analysis, which does not draw attention to packaging specifically and elicits preferences indirectly using simulated shopping – a task consumers are familiar with. Simulations based on the conjoint analysis show that the incremental sales of Products at Issue due to the Images at Issue (primary claim) are so small that even a rigorous survey data on over 20,000 consumer choices (1025 respondents x 20 tasks each) does not rule out the possibility that there is no effect at all. The posterior predictive point estimate (i.e. the single most likely numerical value given the totality of the data) of the effect is that sales would decline about 3.7 percent if the Images at Issue were replaced with alternatives presented in the survey, but this estimate has a large margin of error equal to about 5.8 percent, making it statistically indistinguishable from no effect at all, and even admitting the possibility of a wide range of negative effects.

22.    I also find that any effects the Images at Issue might have on sales must be sub-conscious in that drawing subjects' attention to the images and packaging reduces the effect of the images to almost nothing. Specifically, I find that consumers:

i.    do not like the Images at Issue more than the alternatives developed for this project

ii.    do not respond with increased purchase intent when the images appear in online informational imagery

iii.    consider the attractiveness of packaging the least important feature when it comes to shopping for phone cases from a dozen features we measured.

11

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

23.     My analysis considered both prominent images and background images, and did not find a consistently stronger or weaker effect depending on prominence.

24.     The previous three paragraphs can be summarized as convergent evidence that the Images at Issue have at most a very small, if any, impact on sales whether they appear on packages or in online promotional imagery. My conclusion is that there are no acceptable statistical grounds for attributing any of the sales and, hence, profits of the Products at Issue to the Images at Issue.

25.     My analyses focused on a subset of Images at Issue. Since the other Images at Issue share the look and feel of the two selected images (and the Complaint does not distinguish between the different images in terms of their predicted effectiveness, but rather asserts a consistent "look and feel" for the images), my opinion extends to all the Images at Issue listed in the Complaint. For analogous reasons, my opinion extends to the NUUD product line not explicitly considered in my surveys.

## V.      METHODOLOGY: SURVEY ADMINISTRATION AND SUBJECT SELECTION

26.     To fulfill my assignment, I conducted several online surveys. All survey respondents used in this study have been recruited online by Dynata, a leading online survey company,[8] in September 2021.

27.     Dynata pays it respondents for their time, and I understand that it complies with all standards for conducting reliable online surveys:

 i.     Dynata adheres to a "double-blind" survey; i.e., neither Dynata's staff nor the survey respondents were aware of the survey's author, sponsor, or purpose.

---

[8] Dynata, which was formed through the merger of Research Now and Survey Sampling International, is "the largest online panel data and technology-based research solutions company" (ResearchLive, (2019). Research Now SSI Rebrands to Dynata, available at https://www.research-live.com/article/news/research-now-ssi-rebrands-to-dynata/id/5048462 (last accessed on 12/07/2022)).

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

    ii.    Dynata ensures that a physical individual – not a computer program – is taking the survey.

    iii.    Dynata ensures that the respondent's self-reported age and gender match those on Dynata's records.

    iv.    Dynata ensures that the same individual does not take the survey more than once.

    v.    Dynata ensures that respondents are using a desktop, laptop, or tablet computer (<u>not</u> a mobile phone) to guarantee that survey questions and images appear as designed.

28.    Per the Federal Judicial Center's *Manual for Complex Litigation*, "one of the first steps in designing a survey is to identify the target population (or universe) [which] consists of all elements […] whose characteristics or perceptions the survey is intended to represent."[9] This "must be followed by selection of a sample that accurately represents that population."[10] Failure to select a representative sample renders the survey results a biased representation of the target population's purchasing choices.

29.    All surveys I conducted used screening questions to select the subjects most likely in the market for LifeProof products, i.e. subjects with an active lifestyle, consistent with Plaintiff's allegations in the Amended Complaint and my understanding of LifeProof's marketing strategy. Many LifeProof packages indicate prominently which brand of phone they fit. To make sure the actual real product packages shown in my surveys were relevant to the survey respondents, I thus considered only the iPhone packages and selected only subjects who own an iPhone using a second screening question. Specifically, the two screening questions I used were:

---

[9] Diamond, S. S. (2011). Reference Guide on Survey Research. In Federal Judicial Center / National Academy of Science (Eds.), *Reference Manual on Scientific Evidence* (3rd ed., pp. 359-424). Washington, DC: The National Academic Press, p. 376.
[10] Ibid, p. 380.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

i.   "What brand of smartphone do you own? If you own multiple brands, select the phone you use the most.", gave five options (iPhone, Samsung, Google, LG, and none), and disqualified everyone who did not select "iPhone". The brand list for this screening question was developed using an Internet search for popular smartphone brands in the U.S.

ii.   "Select two of your favorite weekend activities", giving ten options (outdoor recreation, active sports, reading books, watching movies, partying with friends, staying home, getaway trip, family time, eating out, none of the above) presented in random order, and disqualified everyone who did not select at least one of the first two options (i.e., either outdoor recreation or active sports). The order of the options was randomized between respondents, so the qualifying options appeared in random locations on the list. The activity list for this screening question was developed using an Internet search for popular weekend activities in the U.S. The long list of activities ensures a low chance (36 percent) that a respondent not answering truthfully and guessing how to get into the survey and will succeed by selecting two activities at random. To further confirm that ineligible respondents were not being admitted into the survey by simply guessing the two qualifying answers, the survey asks a conceptually similar question about weekend activities just before concluding when respondents no longer have an incentive to misrepresent their interests (see "Validity checks" in Section VIII for details).

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

## VI.   METHODOLOGY: SURVEY DESIGN

30.     To fulfill my assignment, I used a combination of three survey techniques:

i.     Best-Worst scaling survey about the importance of phone case features to consumers

ii.     Conjoint analysis – a survey task that simulates shopping

iii.     Direct "BASES"-style survey questions about intention to buy

In this section, I provide an overview of each survey technique and outline my application of it to measure the impact of the Images at Issue on sales of phone cases.

### A.     Overview of Best Worst Scaling

31.     Best Worst Scaling is a method that facilitates scaled ranking of many product features in terms of consumer stated preference while asking the respondents only simple choice questions with a few features per question. The final ranking is scaled in the sense that it produces a quantitative measure of how important each feature is to consumers. The method models the importance of choices within each task using a standard logit model.[11] The final scaled ranking of each feature corresponds in magnitude to the chance the feature would be chosen as "most important" when matched with two other random features. It can thus be interpreted as a measure of the feature's importance to consumers relative to the other features in the full set of features. Within the scope of my assignment, Best-Worst Scaling is ideally suited to measure the stated importance of packaging to phone case consumers among a large list of phone case features.

32.     The Best Worst Scaling method is well accepted in practice and in academia,[12] and it has been used numerous times to measure consumer attitudes towards

---

[11] https://sawtoothsoftware.com/resources/technical-papers/maxdiff-technical-paper (last accessed 12/09/2022)

[12] E.g., Louviere, J. J., Flynn, T. N., & Marley, A. A. J. (2015). Best-worst scaling: Theory, methods and applications. Cambridge University Press. Flynn, T. N., & Marley, A. A. (2014). Best-worst scaling: theory and methods. In Handbook of choice modelling (pp. 178-201). Edward Elgar Publishing.

product packaging.[13] I teach Best Worst Scaling as a classic marketing research technique in my class for MBA students at UCLA.

**B. Application of Best Worst Scaling to Measure the Stated Preferences of Consumers for Features of Phone Cases**

33.    I designed a survey to apply Best Worst Scaling to Measure the Stated Preferences of Consumers for Features of Phone Cases. The survey started with the two screening questions outlined above.

34.    Based on my research of the phone case category, my experience and knowledge of marketing and consumer behavior, and the documents I reviewed in this matter, I developed the following comprehensive list of 12 features of phone cases:[14]

  i.      protects from drops
  ii.     waterproof
  iii.    protects from dirt
  iv.     durable
  v.      stylish
  vi.     thin
  vii.    good brand
  viii.   attractive packaging box
  ix.     affordable
  x.      sturdy packaging
  xi.     colorful
  xii.    innovative
  xiii.   high quality

---

[13] E.g., Van Schoubroeck, S., Chacon, L., Reynolds, A. M., Lavoine, N., Hakovirta, M., Gonzalez, R., ... & Venditti, R. A. (2023). Environmental sustainability perception toward obvious recovered waste content in paper-based packaging: An online and in-person survey best-worst scaling experiment. *Resources, Conservation and Recycling*, 188, 106682. And also in: Thong, N. T., Thanh, B. Q., Solgaard, H. S., & Yang, Y. (2018). The role of packaging format, alcohol level and brand in consumer's choice of beer: a best-worst scaling multi-profile approach. *Food quality and preference*, 65, 92-100.

[14] And see OP0005100 at -108, -115, and -118.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

The question I set out to answer is how important the "attractive packaging box" feature is to consumers within the above set of features.

35.     Each of the above phone case features I identified might have subtly different meaning to different respondents, so it is important to fix the definition of each feature before asking survey respondents about it. The survey thus started with detailed descriptions of each feature. The introduction said: "In this survey, we will ask you about features you consider important when you shop for a new case for your iPhone. The next few screens will introduce each feature, one at a time." **Exhibit 1** shows the descriptions, including the description of the key "attractive packaging box" feature.

36.     The main Best-Worst section was then introduced as: "Thank you for paying close attention to the descriptions of phone case features. In the next screen, you will see some of the features we just described, and your task will be to choose which of them is the most and least important to you."

37.     The Best-Worst questions followed (see **Exhibit 2** for an example). The design used 14 sets of 4 features per respondent, and was implemented using Sawtooth Software.

38.     The survey concluded with two questions:

i.     a conceptual repeat of the question about weekend activities used in screening, but without the constraint to two: instead of "Select two of your favorite weekend activities", the question was "What activities have you engaged in at least once during the last 12 months? Please check all that apply". This question allows one to both check the reliability of the screening question and further restrict the analysis to only subjects who re-affirm their interest in an active lifestyle. Note that at this point of the survey, the subjects know that they have qualified and will get paid, reducing their incentive to lie about their activities.

17

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

ii.    a question about the year (if any) since when the respondent has been a LifeProof customer. The question asked "When did you first buy a LifeProof protective case for your iPhone?" and gave the following options: Before 2016, 2017, 2018, 2019, 2020, 2021, Never. This question allows one to focus the analysis on a subset of consumers who may have been attracted to the LifeProof brand by the Images at Issue during the period at issue.

## C.    Overview Of Conjoint Analysis

39.    "Conjoint analysis is a state-of-the-art survey-based statistical tool for measuring consumer demand for products that can be readily described to survey respondents as a collection of 'attributes' (i.e., product features) that jointly drive purchase decisions. For example, a smartphone may be readily described by attributes of color, brand, screen size and quality, data capacity, camera quality, ruggedness, and price (e.g., Silver iPhone with 5.8" OLED screen, 256 GB capacity, dual 12 MP camera, and water resistance up to 2 meters depth, sold for $400)."[15]

40.    Survey respondents are presented with alternative sets of products, known as "choice sets" of "store shelves", and asked to select which, if any, products they would buy if the products in front of them were the only ones available.[16] A conjoint survey typically includes 12 to 20 such choice tasks, each with a different set of product profiles

---

[15] Zeithammer, R., & Tomlin, J. (2018). Product Labeling Class Actions - Identifying the 'Con' in Conjoint Surveys. *Bloomberg Law*, available at: https://news.bloomberglaw.com/class-action/insight-product-labeling-class-actionsidentifying-the-con-in-conjoint-surveys (last accessed 12/09/2022).

[16] The type of conjoint analysis described in this section – and employed in my subsequent analyses – is known as Choice-Based Conjoint analysis ("CBC"). CBC has gradually become the predominant type of conjoint analysis, as it "closely mimic[s] the purchase process for products in competitive contexts." The original type of conjoint survey, known as full-profile conjoint, asked respondents to rank each attribute in importance and then rank the levels of each attribute (Orme, B. (2009). Which conjoint method should I use? *Sawtooth Software Research Paper Series*, 1-6, pp. 1-2, available at https://www.sawtoothsoftware.com/support/technical-papers/general-conjoint-analysis/which-conjoint-method-should-i-use-2009 (last accessed 12/09/2022).

18

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

and an outside option commonly described as "None: I would not buy any of these products."[17]

41.     Once respondents' choices are recorded, modern statistical analysis is used to estimate a model of consumer preferences that correctly captures the preferences of each respondent.[18] A representative sample of respondents thus results in a model that can predict the purchasing choices of the underlying population facing an arbitrary set of products constructed from the set of measured product features.[19]

42.     Conjoint analysis is widely employed in academic marketing research over the last 40 years.[20] I regularly teach classes in conjoint analysis that are highly subscribed by MBA and Ph.D. students at UCLA, as do my colleagues in other prestigious business schools. The American Marketing Association offers several courses for practitioners on how to use conjoint methods to study pricing. Bryan Orme, one of the forefathers of conjoint analysis and the president of the company that develops the leading software for conjoint analysis, estimated in 2010 that "It is likely that well over 14,000 conjoint analysis projects are conducted worldwide per year."[21]

43.     Many of these projects are carried out by marketing professionals in commercial research to identify the importance of product attributes and inform pricing decisions. General Motors, Microsoft, and McDonalds are among the many successful

---

[17] Though allowing an outside option is not obligatory in CBC, it is recommended (Sawtooth Software. (2016). Lighthouse Studio v9.0., available at https://sawtoothsoftware.com/help/lighthouse-studio/manual/index.html (last accessed _12/09/2022__).

[18] Lenk, P. J., DeSarbo, W. S., Green, P. E., & Young, M. R. (1996). Hierarchical Bayes conjoint analysis: Recovery of partworth heterogeneity from reduced experimental designs. *Marketing Science*, 15(2), 173-191.

[19] Wittink, D. R., & Cattin, P. (1989). Commercial Use of Conjoint Analysis: An Update. *Journal of Marketing*, 53(3), 91–96; Toubia, O. (2018). Conjoint Analysis. In *Handbook of Marketing Analytics*. Cheltenham, UK: Edward Elgar Publishing.

[20] Green, P. E., Krieger, A. M., & Wind, Y. J. (2001). Thirty Years of Conjoint Analysis: Reflections and Prospects. *Interfaces*, 31(3 Supplement), S56–S73.

[21] Orme, B. (2010). Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research (2nd ed.). Madison, WI: Research Publishers LLC, p. 127.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

companies that have used conjoint analysis to decide which attributes their new vehicle, software, and meal products should have, as well as how to price those attributes.[22]

44.      Conjoint analysis' ability to analyze counter-factual products can also aid the trier of fact in litigation that seeks to assess the effect of alleged conduct on a product's value. For this reason, a number of courts have admitted expert opinion employing conjoint analysis.[23]

45.      Crucially, the product features included in a conjoint survey may be counter-factual, in that they are not currently offered in the real market. The ability to reliably test consumer response to hypothetical product features in a simulated shopping task makes conjoint analysis uniquely suited to the assignment at hand.[24]

---

[22] For General Motors and Microsoft, *see* ibid, pp. 130-131 and pp. 136-139, respectively. For McDonalds, *see* Lang, M. (2011). *Conjoint Analysis in Marketing Research: Fundamentals–Methods–Applications–Critical Assessment*. Munich: GRIN Verlag, p. 12.

[23] E.g., In re Dial Complete Marketing & Sales Practices Litigation, 320 F.R.D 326 (D.N.H. 2017); Broomfield v. Craft Brew Alliance, Inc., Case No. 17-cv-01027, 2018 U.S. Dist. LEXIS 177812 (N.D. Cal. Sept 25, 2018); Schneider v. Chipotle Mexican Grill, Inc., 328 F.R.D. 520 (N.D. Cal. 2018); Fitzhenry v. Dr. Pepper Snapple Grp. Inc., 326 F.R.D. 592 (N.D. Cal. 2018).

[24] Alternative methods for valuing counter-factual attributes or attribute levels fall into two categories. The first is comprised of traditional survey methods, asking respondents directly for their valuation of particular attributes or attribute levels. Evidence suggests that respondents "find it difficult to answer these questions accurately […] partly because such an exercise asks them to think about their preferences in a way that is unfamiliar to them" (Cameron, L., Cragg, M., & McFadden, D. (2013). The Role Of Conjoint Surveys In Reasonable Royalty Cases. *Law360*, available at https://www.law360.com/articles/475390/the-role-of-conjoint-surveys-in-reasonable-royalty-cases (last accessed 12/09/2022). Instead of asking respondents about their preferences, conjoint analysis asks respondents to make simulated purchasing choices and uses those choices to estimate respondents' preferences. Indeed, academics from disciplines outside marketing have also concluded that conjoint analysis can yield less biased results than such survey methods. (Agarwal, J., DeSarbo, W. S., Malhotra, N. K. & Rao, V. R. (2015). An Interdisciplinary Review of Research in Conjoint Analysis: Recent Developments and Directions for Future Research. *Customer Needs and Solutions*, 2(1), 19-40). The second alternative method for valuing counter-factual attributes or attribute levels involves applying statistical models to data on actual purchasing choices. Though this method is theoretically sound, it is not feasible in the present case due to lack of data with sufficient exogenous variation in the feature at issue, namely presence of a particular photo.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

### D. Six Core Requirements For Designing An Accurate Conjoint Analysis Survey and Using the Results to Calculate Incremental Sales

46.     There are six core requirements for designing a conjoint analysis that can accurately estimate consumers' preferences:

i.    realistic attribute selection

ii.   faithful attribute representation

iii.  avoiding demand effects

iv.   avoiding biased questions

v.    screening out inattentive respondents.

vi.   accounting for the competition and supply side in the market

I now discuss each of these requirements in turn.

47.     The **first requirement** for designing an accurate conjoint survey is to identify which attributes of the products in question drive consumers' purchase decisions.[25] This requires "an understanding of the consumer's choice process, more specifically salient attributes involved in the choice of an alternative by a majority of target consumers."[26] Similarly, the expert should exclude attributes that consumers do not consider salient in their purchasing decisions. To develop an understanding of which attributes are salient, the expert must conduct thorough research on consumer behavior in the relevant market and/or consult with parties that have deep subject-matter knowledge on the topic.[27]

---

[25] "[S]election of attributes and levels is a very crucial step in the design of conjoint studies" (Rao, V. R. (2011). *Applied Conjoint Analysis*, New York, NY: Springer, p. 43).

[26] Ibidem.

[27] "[T]heoretically, the choice of attributes should not have a significant impact on the results because respondents are told to hold all other attributes constant. However, consumers may hold different views on which attributes are being held constant." Nevertheless, "consumer perceptions of what is being held constant will be a lesser concern when people are familiar with the product under consideration" (Cameron, Cragg, & McFadden (2013)).

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

48.     The **second requirement** for an accurate conjoint survey is to describe the levels of attributes faithfully, as they appear on the products in question. Nobel-prize winning economist Daniel McFadden and coauthors suggest that "the menus of products and their descriptions [should be] designed to realistically mimic a market experience where a consumer can choose among various competing products."[28] Divergence between the way products are presented to respondents in the survey and the way consumers would actually encounter these products in a retail setting undermines the accuracy of the conjoint analysis.[29]

49.     The **third requirement** for an accurate conjoint survey is to not draw undue attention to a particular attribute, either by highlighting it in the introduction or the conjoint questions themselves, or by including too few attributes.[30] This can lead respondents to infer and select the answer expected by the expert – so called "demand effect" in survey research – instead of responding truthfully, thus distorting which attributes influence their actual purchase decisions.[31] In this event, respondents' valuations become biased in the direction of the expert's hypothesis.

50.     The **fourth requirement** for an accurate conjoint survey is that the survey's questions and structure should not influence respondents' choices.[32] If respondents are steered towards a particular product, attribute, or attribute level, then the

---

[28] Ben-Akiva, M., McFadden, D., & Train, K. (2019). Foundations of Stated Preference Elicitation: Consumer Behavior and Choice-based Conjoint Analysis. *Foundations and Trends in Econometrics*, 10(1-2), 1–144, p. 11.

[29] *E.g.*, in *Townsend v. Monster Beverage Co.,* plaintiffs' expert designed a survey that altered the actual language used on product labels of the beverages at issue. The court excluded the expert from testifying on the results of these surveys (Case No. 5:12-cv-02188, Order Denying in Part and Granting in Part Defendants' Motion to Strike Stefan Boedeker's Expert Report and Testimony (C.D. Cal. Dec. 20, 2018)).

[30] Zeithammer and Tomlin (2018).

[31] This phenomenon is known as a "demand effect" in survey research.

[32] This requirement is not specific to conjoint analysis – all survey approaches need to avoid biased or leading questions.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

survey results will be biased in the direction of the steering. Similarly, the survey instructions and questions must be clear and unambiguous.

51.     The **fifth requirement** for an accurate conjoint survey is that seemingly irrational or inattentive respondents be screened out of the subsequent data analysis.[33] In every survey, some respondents do not pay attention to the instructions or do not understand them. Such respondents can be detected by carefully designed questions, and they can also reveal themselves by completing the survey much faster than the average respondent.[34] Including such respondents in the survey results can bias the results and reduce their validity as predictions of actual consumer behavior in the marketplace.

52.     A successful calculation of the incremental sales from a change in one attribute, such as the package design, must combine the estimated statistical model of consumer behavior with an adequate representation of the market's supply side; i.e., a model of competition and a model of all firms' counter-factual behavior in terms of pricing, promotion, and distribution.[35] The **sixth requirement** for using conjoint analysis accurately to calculate incremental sales is that the set of competitors used in the market simulator, as well as the pricing strategies of all competitors, reflect the situation in the market at the time of interest to the case. When counter-factual markets are simulated, the pricing strategies of all firms must be allowed to react to large changes in product qualities.

---

[33] Toubia, O. (2018). "Conjoint Analysis". In Handbook of Marketing Analytics. Cheltenham, UK: Edward Elgar Publishing.

[34] Oppenheimer, D. M., Meyvis, T., & Davidenko, N. (2009). Instructional manipulation checks: Detecting satisficing to increase statistical power. *Journal of Experimental Social Psychology*, 45(4), 867-872.

[35] Zeithammer, R., & Tomlin, J. (2018). Product Labeling Class Actions - Identifying the 'Con' in Conjoint Surveys. *Bloomberg Law*, available at: https://news.bloomberglaw.com/class-action/insight-product-labeling-class-actionsidentifying-the-con-in-conjoint-surveys (last accessed on 2/13/2020).

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

### E.    Application of Conjoint Analysis to Measure Incremental Sales of Phone Cases due to the Images at Issue

53.    To measure the incremental sales due to the Images at Issue, I selected the two most popular models of phone cases with Images at Issue on their packages (FRE and SLAM), along with the Images at Issue most prevalent on the respective packaging of these two models.[36] My understanding is that the Image at Issue on the packaging of FRE was the Dirtbike (Registered photograph #1) and the most prevalent Image at Issue on the packaging of SLAM was the Running Woman (Registered photograph #96). The SLAM package also included the Bikerider (Registered photograph #81) in the background. The two actual package designs are shown in **Exhibit 3**, and the Images at Issue are highlighted in Section III. Note that the Image at Issue on FRE is in the background while SLAM includes both a main foreground image at issue and a second image at issue in the background. This variation is useful to gauge the relationship between the effect on sales and photo prominence.

54.    For each of the two focal packages described in the previous paragraph, Otter Products provided me with an alternative counter-factual package design that excludes the relevant Image at Issue. My request was for alternative package designs that change the photo from the respective Images at Issue to an alternative image, but leave everything else unchanged because my task was to isolate the effect of the artistic value of the photo rather than the overall artistic value of the package, including its graphical treatment, product window, etc. The two alternative package designs are shown in **Exhibit 4**. Conjoint analysis can be used to measure the impact of switching from the counter-factual packages to the actual packages on consumer demand.

55.    My understanding based on discussions with Alex Vats and internal research documents from Otterbox is that during the time relevant to the dispute, the FRE

---

[36] Conversations with Alex Vats (September 8, 2021 and December 5, 2022) revealed that FRE was more popular than SLAM, and there was another product called NEXT that was also popular but its packaging did not include any images at issue.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

case was also sold in a package without any images at all.[37] That design is shown in **Exhibit 5**. Specifically, a May 2018 internal report (commenced in Q1 2018, i.e. pre-dating the present dispute) calls the packaging of **Exhibit 5** an "ATT pack" and mentions that "LifeProof packaging has already begun migrating to the ATT pack for all channels".[38]  Alex Vats confirmed this fact, and explained that the package was developed to address a concern from AT&T managers who felt strongly that the lifestyle images on LifeProof packages took too much attention and space away from showing the product.[39] Another reason to switch to a package with a large product window was to reduce costs by aligning packaging construction of LifeProof with that of Otterbox phone-case packages.[40] Conjoint analysis can be used to measure the impact of switching from the image-free FRE package to the actual FRE package on consumer demand. This is an important comparison because LifeProof eventually switched away from photographs on packaging towards packaging similar to the one in **Exhibit 5**.

56.     While my survey approach will test both alternatives to the FRE package (i.e. the mock alternative with different photo and the real-world "ATT Pack" alternative without photos) on a level playing field, there are at least four reasons to believe that the FRE alternative without photos will perform better than the FRE alternative with photos.

i.     First, as mentioned in the previous paragraph, LifeProof deliberately switched to the image-free ATT Pack without images after an internal package review that pre-dated the current dispute. Switching towards a particular package means that the package was successful. Alex Vats explained that the switch

---

[37] Conversation with Alex Vats (Sept. 8, 2021); Conversation with Alex Vats (Dec. 5, 2022).

[38] Packaging Eval. LifeProof Report. May 2018 by Molly Funkhouser and Robert Goldberg (OP0004684).

[39] Conversation with Alex Vats (Dec. 5, 2022).

[40] The January 2019 Report "LifeProof Packaging Eval. Report" by Robert Goldberg (OP0004561), p.7: "Product Team Action: Created proposed designs based on retail feedback (see more of the product window) and cost-saving opportunities (utilize OtterBox packaging more)".

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

was a stopgap measure while a new image-free package was developed and tested.[41]

ii.   Second, Alex Vats explained to me that buying managers from key account partners pushed back against the lifestyle images on the LifeProof packaging and asked for packaging that showed more of the product – a major take-away from internal research reports.[42] Specifically the May 2018 report explains that "The primary change in packaging is the move from a Lifestyle image focus to a full pack window execution" because all the images on the package take up too much space, and "The reduced attention to the product window of the phone type contributes to confusion as to the color of the smartphone case as well, with just 2 out of 5 consumers accurately describing the correct color combination"[43].

iii.   Third, internal documents show that most consumers did not relate to the images, possibly because they often represented extreme sports most people do not participate in.[44] Alex Vats explained that LifeProof managers were aware of these issues even before the time relevant to the present dispute.[45] For example, the SLAM package used to feature a skateboarder, but some people found that to be a turn-off, so the image was replaced with the runner image shown in **Exhibit 3**.

---

[41] Conversation with Alex Vats (Sept. 8, 2022); Conversation with Alex Vats (Dec. 5, 2022).
[42] The January 2019 Report "LifeProof Packaging Eval. Report" by Robert Goldberg (OP0004561), p.7: Under the heading "Pack test Round 1", the report says "Customer Insight Recommendations: Explore dialing back the overall size of the Lifestyle images to accommodate increased wording and product specific communication."  And see Conversation with Alex Vats (Sept. 8, 2022, Dec. 5, 2022).
[43] Packaging Eval. LifeProof Report. May 2018 by Molly Funkhouser and Robert Goldberg (OP0004684).
[44] The January 2019 Report "LifeProof Packaging Eval. Report" by Robert Goldberg (OP0004561), p.19: Only 14% of respondents related to the images on the FRE package, and only 36% related to the images on the SLAM package.
[45] Conversation with Alex Vats (Sept. 8, 2022, Dec. 5, 2022).

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

iv.   Fourth, Alex Vats explained that the image-free packaging designs reflected in the internal packaging studies do not reflect the actual packaging deployed to replace both the packaging featuring Images at Issue and the AT&T packaging.[46] Instead, the AT&T packaging merely motivated the re-design, and the eventual package introduced in the Fall of 2019 was a combination of the concepts tested in the January 2019 report.[47]

57.   Since the packaging designs reflected in the internal packaging studies do not reflect the actual packaging deployed, the results from the studies are not directly interpretable in the context of my assignment. Instead, they merely provide clear evidence that LifeProof was moving towards image-free packaging in early 2018 for all the reasons outlined in this paragraph.

58.   At the time relevant to the dispute, the LifeProof cases competed with phone cases sold by several other brands, and capturing the relevant contemporaneous competition is critical to developing a good market simulator from the results of a conjoint survey (sixth requirement). Since the LifeProof brand targets people with active lifestyles, it is important to focus the competitive analysis on other brands that serve that consumer segment. Based on my own research of the market and on discussions with Alex Vats at Otter[48], I identified the following competitor brands and relevant product lines:

i.   Otterbox (with the Symmetry line competing predominantly with SLAM and Commuter line competing predominantly with FRE).

---

[46] Ibid.
[47] The January 2019 Report "LifeProof Packaging Eval. Report" by Robert Goldberg (OP0004561), p.19 and Conversation with Alex Vats (Dec. 5, 2022). And see LifeProof Packaging Eval. Report. January 2019 by Robert Goldberg (OP0004561).
[48] Conversation with Alex Vats (September 8, 2021).

27
EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

ii.     Tech21 (with at least three prominent product lines, including the sleek Clear and the waterproof Aqua)

iii.    Catalyst (a prominent waterproof case at the time).

59.     By working from historical sources (such as online product reviews), as well as through discussions with Alex Vats[49], I identified the following historical price-points for all the products in the study, as below.  Minor variations in pricing would not impact the results much, as the effect being measured is the change in consumer preference based on replacement of imagery while keeping the prices fixed.

**Table 1: List of competitors and historical pricing**

| Label | Price[50] |
|---|---|
| LifeProof FRE | $89.99 |
| LifeProof SLAM | $49.99 |
| Otterbox Commuter | $39.99 |
| Otterbox Symmetry | $39.99 |
| Tech21 Check | $49.99 |
| Tech21 Clear | $39.99 |
| Tech21 Aqua | $79.99 |
| Catalyst | $79.99 |

---

[49] Ibid.

[50] https://macsources.com/lifeproof-fre-iphone-7-case-review/ (Mar. 24, 2017), https://www.imore.com/lifeproof-slam-iphone-case-protection-without-major-bulk (Dec. 10, 2018), https://www.androidheadlines.com/2017/05/otterbox-commuter-series-galaxy-s8-s8-plus-review.html (May 11, 2017) https://www.macobserver.com/reviews/quick-look/review-special-otterbox-clear-case-iphone-x/ (Dec. 12, 2017), https://appadvice.com/products/guides/iphone-8-cases/754204 (Oct. 6, 2017), https://www.macworld.com/article/229850/12-cases-that-will-look-fabulous-on-your-new-red-iphone-7.html (Apr. 3, 2017), and https://www.popsugar.com/smart-living/Best-Waterproof-Phone-Cases-2017-43569055#photo-43569075 (May 25, 2017) (last accessed 12/07/2022); Conversation with Alex Vats.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

60.     To satisfy the first requirement for an accurate conjoint analysis, I need to identify attributes that are a priori important to the target population. In addition to images in package design (the attribute at the center of the present dispute) and the obviously important attributes of brand, model, and price, I have identified the following attributes as important to consumers in the active lifestyle segment shopping for cases to protect their iPhones:

i.    Type of protection (e.g. water proof, snow proof, drop proof)

ii.   Aesthetic design of the case

The main support for the importance of the above attributes is internal research at Otter which finds that consumers care about "protection, durability, reasonable price, style, thinness, and brand"[51]. Another reason why I believe these attributes to be important is that they appear repeatedly on packages of phone cases.

61.     To satisfy the second requirement for accurate conjoint analysis, I need to represent all the attributes in the simulated shopping task faithfully to the way they are presented at the point of sale. Attributes such as images in package design or aesthetics of the case itself are not separately highlighted to consumers, so I represent the packages and cases visually (see **Exhibit 6** for an example task), satisfying the third requirement in the process.  Different companies choose different ways to show the aesthetic of their cases at the point of sale, usually by incorporating a clear window into a part of the package. To satisfy the second requirement, I preserve these marketing decisions and show all the products packages the way they were on store shelves. Different companies use different wordings to describe the Type of protection attribute (e.g. "drop protection" vs. "drop proof"). To satisfy the second requirement, I preserve these marketing decisions and use each brand & model's wording verbatim. In addition, I restrict the type of protection descriptions to the actual descriptions on the actual packages. Since the

---

[51] Otter Products Brand Health Survey, December 2017 (OP0005100), p. 16.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

resolution of the images is limited, I list the descriptions below every package shown (see Exhibit 6 for an illustration).

62.     The conjoint analysis design I employ represents each product in terms of all the a priori important attributes I identified, but it does not actually vary all of these attributes in a way that their importance could be measured. For example, it does not separate brands from package designs, i.e. it never shows a LifeProof package with the brand name replaced by "Catalyst". The only attributes that are actually systematically varied in the background are price and model, with the LifeProof product packages each appearing in two variants: actual and counter-factual. The overall design thus uses the following attributes and levels:

i.     Brand & Model attribute:

| LifeProof FRE actual package |
| LifeProof FRE alternative photo package |
| LifeProof FRE actual no photo package |
| LifeProof SLAM actual package |
| LifeProof SLAM alternative photo package |
| Otterbox Commuter |
| Otterbox Symmetry |
| Tech21 Check |
| Tech21 Clear |
| Tech21 Aqua |
| Catalyst |

ii.     Price attribute: I used the following equi-spaced levels which span the pricing of phone cases relevant at the time.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

| |
|---|
| $39.99 |
| $49.99 |
| $59.99 |
| $69.99 |
| $79.99 |
| $89.99 |

63.     The main strength of the above design is that it can answer my main assignment question while <u>both</u> remaining simple behind the scenes and at the same time keeping the product offerings as realistic and richly described to be faithful to reality (second requirement). I do not need to vary the Images independently of Brands and models because my goal is only to determine the incremental sales of respective LifeProof products due to the Images at Issue, which is readily accomplished by comparing the predicted sales of the LifeProof Product with actual package to the predicted sales of the same LifeProof Product with the alternative package. A similar design has been accepted by the courts at least once in the past as a valid source of data for the purposes of profit apportionment in a copyright infringement lawsuit related to photos on packages – an analogous situation to that in the present dispute.[52]

64.     Having explained the choice of attributes and their levels, I now turn to the details of my survey design. The survey proceeded as follows:

i.    Screening questions to isolate iPhone users with an active lifestyle (see above for details).

ii.   Introduction to the survey, which said "This survey will ask you about your preferences for protecting your iPhone with a case. In the first part of the survey, you will indicate which product you would buy in a series of simulated shopping scenarios. The second part of the survey will ask additional questions

---

[52] George Derpanopoulos, Ph.D. et. al., The Use of Conjoint Analysis in High-Stakes Litigation: A Historical Review Up to Navarro et. al., v. Procter and Gamble, Which Withstood A Rigorous Daubert Challenge, 102 J. Pat. & Trademark Off. Soc'y 502 (2022).

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

about you and your shopping experiences." This text is as neutral as possible, and refrains from drawing undue attention to packaging, LifeProof, images, or any other aspect of the product. It thus satisfies the third requirement of accurate conjoint analysis.

iii.  Introduction to the attributes, which is shown in **Exhibit 5** including formatting. Again, the introduction is as neutral as possible, and refrains drawing undue attention to packaging, LifeProof, images, or any other aspect of the product. It thus satisfies the third requirement of accurate conjoint analysis.

iv.  Conjoint Analysis consisting of 15 Random Tasks (a sample task is shown in **Exhibit 6**) and 5 Fixed Tasks described below. For realism (second requirement), the description of brands, models and features in the choice tasks is communicated visually via a large picture of the package, and only too-small-to-read-online text relevant to features of the product is repeated below the picture of the package.

65.  I now briefly describe the Fixed Tasks and their purpose. While the 15 Random Tasks vary across respondents (using Sawtooth's sophisticated experiment design algorithm), the fixed tasks are the same for all respondents. I designed four of the Fixed tasks (1-4) for model-free measurement of the direction of the effect and the last Fixed task (Task 5) to detect inattentive respondents. The Fixed tasks were:

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

**Table 2: Fixed tasks used in the experiment**

| | Product 1 | | Product 2 | | Product 3 | |
|---|---|---|---|---|---|---|
| Fixed task | *Brand & model* | *Price* | *Brand & model* | *Price* | *Brand & model* | *Price* |
| Task 1 | LifeProof FRE actual | $89.99 | Otterbox Commuter | $69.99 | Tech21 Aqua | $79.99 |
| Task 2 | LifeProof FRE alternative | $89.99 | Otterbox Commuter | $69.99 | Tech21 Aqua | $79.99 |
| Task 3 | LifeProof SLAM actual | $69.99 | Otterbox Symmetry | $59.99 | Tech21 Clear | $49.99 |
| Task 4 | LifeProof SLAM alternative | $69.99 | Otterbox Symmetry | $59.99 | Tech21 Clear | $49.99 |
| Task 5 | Otterbox Commuter | $69.99 | Otterbox Commuter | $49.99 | Tech21 Check | $59.99 |

66.     The model-free measurement of the effect of the Dirtbike image on FRE demand is the comparison of the proportion of respondents choosing FRE in Fixed Task 1 to the proportion of respondents choosing FRE in Fixed Task 2. Analogously, comparing choices in Tasks 3 and 4 measures the effect of Running Woman image on the demand for SLAM.[53] Finally, the respondents choosing the more expensive but otherwise equivalent version of the OtterBox Commuter in Fixed Task 5 are deemed not to be paying attention or not understanding the instructions of the survey. This type of attention check task is backed up by psychological research,[54] and its use is standard in conjoint analysis.

67.     After the conjoint questions, the survey turned to questions about the respondent and their experience with phone cases. The specific questions were:

---

[53] Note that these comparisons measure the direction of the effect, but likely exaggerate its magnitude by keeping competition limited to two other brands. Moreover, they do not benefit from pooling information about consumer preferences across all the remaining tasks in the conjoint survey. For both reasons, the simulated market shares based on the complete results and complete competitive landscape are better at gauging the magnitude of the effect.

[54] e.g., Oppenheimer, D. M., Meyvis, T., & Davidenko, N. (2009). Instructional manipulation checks: Detecting satisficing to increase statistical power. *Journal of Experimental Social Psychology*, 45(4), 867-872.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

i.   A single question "How many protective cases for your phone(s) have you bought in the last year?" to measure the personal use volume in the category. The options were: 0, 1, 2, 3, and 4+. This question is essential for correctly weighting individual-level simulations before adding them up to the population level: people who buy more cases need to count proportionally more in the construction of overall simulated market share. I assign the following weights to the five options in the answer to this question: 1, 2, 3, 4, and 5 to approximate the total number of purchases the person made in the category in recent years. In other words, I assume that everyone had one case going into "last year" (a case they presumably purchased at some point beforehand), and then purchased the stated number of cases in the last year, with the "4+" response conservatively treated as 4 purchases, which served to give all respondents at least some weight in the survey results.

ii.   A block of questions designed to measure the effect of Images at Issue used in online informational imagery on purchase intent. The reason for conducting this analysis is to check whether the images might increase the sale of products at issue indirectly, i.e. when used in product descriptions versus on product packaging. I relied on one original informational image shown in **Exhibit 7**, and one alternative counter-factual image (provided to me by Otter Products) shown in **Exhibit 8**. To allow both a clean and a statistically powerful measurement of the effect at issue, I employed a survey type known as a "balanced crossover design". In a balanced crossover design, all respondents see both the actual and counter-factual stimulus, but they see them in random order. Specifically, the block of questions was designed to randomize the order in which each respondent saw the two versions of the image, as follows:

1.   First purchase intent question (either actual or alternative image) explained in detail in the next paragraph

34

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

2.     Demographic questions about age, gender, state and income

3.     Decoy purchase intent question about some other product (not analyzed)

4.     A conceptual repeat of the question about weekend activities used in screening, but without the constraint to two: instead of "Select two of your favorite weekend activities", the question was "What activities have you engaged in at least once during the last 12 months? Please check all that apply". This question allows one to both check the reliability of the screening question and further restrict the analysis to only subjects who re-affirm their interest in an active lifestyle. Note that at this point of the survey, the subjects know that they have qualified and will get paid, reducing their incentive to lie about their activities.

5.     Second purchase intent question (either actual or alternative image) explained in detail in the next paragraph

iii.     To measure the purchase intentions of survey respondents, I utilized the five-point purchase intention scale from the Booz-Allen Sales Estimating System ("BASES"). BASES is an industry-standard procedure for assessing the sales potential of hypothetical products prior to their introduction to the market.[55] BASES starts by assessing consumers' purchase intention response to a product concept on a five-point scale. The five-point scale ranges from "Definitely Will Not Buy" to "Definitely Will Buy" (see **Exhibit 9** for a sample). To answer the question, the respondent must move a slider below the five options. The slider starts in the middle but has to be moved before the respondent can select an answer – including the middle option – in order to not bias responses in favor of any option.

---

[55] https://innovation.nielsen.com/products-for-the-new-normal (last accessed 12/07/2022).

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

iv.   It is well established that consumers are overly optimistic when responding on the purchase intention scale in BASES, but it is also well established that a higher average purchase intention for a product concept eventually translates to higher sales.[56] For the purposes of my analysis, the positive underlying relationship – whatever its exact nature may be – between respondents' BASES scale response and their eventual buying behavior is sufficient to measure the direction of the effect of the Images at Issue on the demand for the phone cases advertised in the online informational images. This is because I compare responses to the same scale question for the same product within a single respondent. Any bias that may exist when measuring purchasing intentions using the BASES scale affects the two responses equally, and hence cancels out when calculating the difference in the purchase intentions.

v.    The survey continued with a set of questions about familiarity with the different brands of phone cases, and an open-ended question asking the respondents to guess the purpose of the survey (to guard against potential demand effects).

vi.   The survey continued with a question about year (if any) since when the respondent has been a LifeProof customer. The question asked "When did you first buy a LifeProof protective case for your iPhone?" and gave the following options: Before 2016, 2017, 2018, 2019, 2020, 2021, Never. This question allows one to focus the analysis on a subset of consumers who may have been attracted to the LifeProof brand by the Images at Issue during the period at issue.

vii.  With the purpose of the survey at least partially revealed by the pointed question about LifeProof, the survey concluded with direct side-by-side liking

---

[56] https://www.ashokcharan.com/Marketing-Analytics/~pv-BASES.php (last accessed 12/07/2022).

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

comparisons of the two sets of packages (two versions of FRE and two versions of SLAM). **Exhibit 10** shows an example of the task. The left-right position of the two package versions was randomized to avoid any position effects. These questions allow a direct measurement of consumer attitudes toward the package designs, but suffer from drawing attention to differences that consumers may not notice in the real world. Another reason why these direct measurements only play a supporting role in my analysis is that the task of deciding which package they like more is less familiar to the consumers than simply shopping for phone cases (the key advantage of choice-based conjoint analysis is that it simulates shopping).

68.    Having laid out the flow of the survey, I now summarize how I used the survey result to answer my assignment questions. The method for measuring the incremental sales due to the Images at Issue proceeds in two steps:

i.   Measure "part worth" demand for all the prices, brands and models included in the study.

ii.   Simulate the market in Table 1 separately, first with the actual LifeProof packaging, second with the alternative packaging but everything else (i.e. prices and competitors) held the same, and then compare the simulated market share of the two LifeProof products under the two scenarios.

69.    Note that the method I use assumes the counter-factual prices (i.e. the prices that would prevail if LifeProof packages used alternative designs) are the same as the actual prices (the prices used in the simulation of the market with actual packages, shown in Table 1). This assumption satisfies the sixth requirement for the following two reasons: first, the two <u>actual</u> versions of the FRE product (the alternative image and no image versions) did not differ in price as far as I know, so it does not seem that LifeProof changes its pricing depending on package design. Second, the differences in demand

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

partworths between actual and counter-factual package designs turn out to be small, so it is unlikely that a switch to the counter-factual designs would provoke a pricing response by competitors. In other words, regarding the supply-side effects discussed in Tomlin and Zeithammer (2018), keeping counter-factual prices same as actual is scientifically sound when the effect of images on market share is relatively small, and so unlikely to trigger a price adjustment either by LifeProof or by competitors.

70.     While I explained my reasons for keeping counter-factual prices the same as actual prices, it is important to also discuss other assumptions I could have made and explain their downsides in the present situation. Numerous techniques have been developed for predicting counter-factual prices; that is, the prices of all products in the market that would prevail if a certain attribute were to change.[57] When the relevant market only involves a few large firms that can be represented as profit-maximizing agents facing constant marginal costs and playing a stable Nash Equilibrium in prices, one can estimate the impact of a change in one firm's product on all prices in the market using structural models.[58] However, such modeling involves a host of additional assumptions not usually satisfied in consumer markets for electronics and accessories, which have complicated distribution networks, proliferating product lines, and competition both within and across product categories. In such markets, and especially when the counter-factual product attribute has a small impact on consumer demand – as I will demonstrate to be the case with the respective Products at Issue – it is simpler and more externally valid to assume that counter-factual prices would be the same as actual prices.

---

[57] Orme, B., & Johnson, R. (2006). External Effect Adjustments in Conjoint Analysis. In SAWTOOTH SOFTWARE CONFERENCE.

[58] Allenby, G. M., Brazell, J., Howell, J. R., & Rossi, P. E. (2014). Valuation of Patented Product Features. *Journal of Law and Economics*, 57(3), 629-663.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

## VII.   RESULTS: IMPORTANCE OF PACKAGE ATTRACTIVENESS TO CONSUMERS

71.     Dynata invited 6,942 potential respondents from its General U.S. Population panel into the survey. 5,689 of the invitees were disqualified for either not having an iPhone and/or not having an active lifestyle, 554 did not finish the survey, and 700 finished the survey. The median completion time was 5.1 minutes. We eliminated 76 respondents who completed the survey too quickly (faster than 3 minutes), resulting in 624 respondents taken to analysis. The median retained respondent took 5.5 minutes to complete the survey. 361 of the respondents responded on a device with a screen width of more than 600 pixels, and we analyze them separately to check whether screen size makes a difference (it does not, it turns out).

72.     Table 3 shows the feature importance scores rescaled as percentages, and sorted according to the "All respondents" column in descending order. It is immediately apparent that attractive packaging is the least important feature to consumers.

73.     To better understand the strength of the evidence behind Table 3, Table 4 presents a simple count analysis of the data. Since each feature appeared in about the same number of tasks and the selection of the quadruple of features into any single task is more or less random, counting how many times a feature was selected as "most important" produces a meaningful ranking of features. It is immediate that the ranking based on counts is the same as the model-based ranking of Table 3. It is immediately apparent from Table 4 that the "attractive packaging" feature is deemed so unimportant in the context of shopping for phone cases that subjects select it as "Least Important" from among four features about two thirds of the time, and they select it as "Most important" less than one percent of the time.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

**Table 3: Feature Importance Scores Rescaled as Percentages**

| Feature | All (N=624) | Still active (N=513) | Large screen (N=361) |
|---|---|---|---|
| drop | 15.6 | 16.5 | 14.8 |
| high quality | 14.6 | 14.9 | 14.9 |
| durable | 13.8 | 14.6 | 13.4 |
| water | 11.8 | 12.1 | 11.3 |
| affordable | 8.3 | 8.4 | 8.6 |
| dirt | 8.2 | 8.2 | 7.8 |
| branded | 6.9 | 6.5 | 7.4 |
| innovative | 5.6 | 5.4 | 5.5 |
| thin | 4.7 | 4.6 | 5.1 |
| stylish | 3.7 | 3.2 | 3.8 |
| sturdy packaging | 2.8 | 2.3 | 3.1 |
| colorful | 2.4 | 2.1 | 2.8 |
| **attractively packaged** | **1.5** | **1.1** | **1.6** |

**Table 4: Model-free count analysis of feature importance**

| Feature | Times Shown | Times Selected Most Important | Most Important Count Proportion | Times Selected Least Important | Least Important Count Proportion |
|---|---|---|---|---|---|
| drop | 2,680 | 1,544 | 0.576 | 239 | 0.089 |
| high quality | 2,680 | 1,314 | 0.49 | 153 | 0.057 |
| durable | 2,692 | 1,253 | 0.465 | 199 | 0.074 |
| water | 2,692 | 1,074 | 0.399 | 283 | 0.105 |
| affordable | 2,690 | 714 | 0.265 | 447 | 0.166 |
| dirt | 2,684 | 659 | 0.246 | 399 | 0.149 |
| branded | 2,692 | 561 | 0.208 | 518 | 0.192 |
| innovative | 2,690 | 372 | 0.138 | 576 | 0.214 |
| thin | 2,684 | 369 | 0.137 | 778 | 0.29 |
| stylish | 2,698 | 279 | 0.103 | 956 | 0.354 |
| sturdy packaging | 2,695 | 239 | 0.089 | 1,170 | 0.434 |
| colorful | 2,689 | 184 | 0.068 | 1,290 | 0.48 |
| attractively packaged | 2,678 | 174 | 0.065 | 1,728 | 0.645 |

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

74.     The question about activities used in screening allows one to check whether the screening question is working as expected. Of the 624 respondents who checked one or both of the active lifestyle options ("outdoor recreation" and "active sports") and thus qualified for the survey, only 111 (17.7%) did not check either of them at the end of the survey. This pattern is not consistent with random attempts at getting into the survey. Instead, it is consistent with small errors people make in judging which two activities they engaged in during the last 12 months, as well as the possibility that they were not able to engage in all of their favorite activities (recall that the screening question is about "favorite" activities and the conceptual replication is about "activities engaged in during the last 12 months"). I conclude the screening question is working well in finding people with active lifestyles.

75.     Another analysis the question about activities allows is to focus only on people who reaffirm having an active lifestyle. 513 (=624-111) did to, and the middle column in Table 3 (labeled "Still Active") shows that restricting the analysis to them does not change the pattern of results.

76.     Based on both the low percentage importance in Table 3 and the model-free evidence in Table 4, I conclude that consumers consider the attractiveness of packaging to be the least important feature of all the thirteen features we tested.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

## VIII.  RESULTS: INCREMENTAL SALES DUE TO IMAGES AT ISSUE BASED ON FULL DATASET AND ESTIMATED MODEL

77.     Dynata invited 14,909 potential respondents from its General U.S. Population panel into the survey, asking respondents to answer the survey on a computer or tablet only (to ensure adequate representation of the images). 8,966 of the invitees were disqualified for either not having an iPhone or not having an active lifestyle, 4,546 did not finish the survey, and 1,397 finished the survey. Of the qualified respondents who finished the survey, we eliminated further 372 who either completed the survey too quickly (faster than 4 minutes) and/or responded on a smartphone (a device with a screen width of less than 600 pixels). The median completion time among the retained respondents was 8.1 minutes. The resulting sample taken to analysis was 1025 respondents. This is the largest sample I have encountered in a litigation context in my career so far, and it should detect even small effects.

78.     Before discussing the main result of this section, I focus on several validity checks. The follow-up question about activities used in screening allows one to check whether the screening question is working as expected. Of the 1025 respondents who checked one or both of the active lifestyle options ("outdoor recreation" and "active sports") and otherwise qualified for analysis (see previous paragraph), only 129 (12.6%) did not check either of them at the end of the survey. This pattern is not consistent with random attempts at getting into the survey. Instead, it is consistent with small errors people make in judging which two activities they engaged in during the last 12 months, as well as the possibility that they were not able to engage in all of their favorite activities. I conclude the screening question is working well in finding people with active lifestyles.

79.     Another validity check available is the open-ended question "The survey is almost finished. What do you think it was trying to find out or measure? Please write a sentence or two." No person mentioned the word "package", and only one person

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

mentioned the word "photo" (that person says "add some photos"). The predominant response other than something similar to "I like the survey" was a statement semantically equivalent to "I think the survey was about what features of a phone case are important and how much people will pay." Only five people mention "LifeProof". They say:

i. "Wondering if I knew Otterbox and LifeProof are owned by the same company."

ii. "How much a person will pay for a phone case, which is interesting because that's the going rate for a LifeProof case and it's overpriced!"

iii. "If I would continue to pay over $80 for my FRE LifeProof case or would I prefer to purchase a cheaper case."

iv. "Provide the characteristics of four protective case manufacturers - Catalyst, LifeProof, Otterbox and Tech 21 with the retail prices."

v. "Price sensitivity of LifeProof products. Brand loyalty"

80.    I conclude that even the very few people who mention "LifeProof" did not guess the actual purpose of the study. Overall, there is no evidence of a demand effect based on the open-ended question, and so the study satisfies the third requirement for accurate conjoint analysis.

81.    I analyzed both surveys' responses to choice tasks using the Hierarchical Bayes Multinomial Logit Model ("HB-MNL"), implemented in Sawtooth Software. HB-MNL is a state-of-the-art technique for analyzing the choice data produced by conjoint surveys.  For each survey, I ran the Markov Chain Monte Carlo routine for 50,000 iterations before collecting draws for my statistical model, which was based on 50,000 subsequent iterations. I used graphical information about the time series of population-level parameters to ensure convergence of the statistical models. The estimation techniques I used are standard in the fields of Bayesian statistical analysis and choice

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

modeling, and I am an expert on the inner workings of these techniques, having authored peer-reviewed articles on the subject.[59]

82.      I then used Sawtooth Software to build my market simulators; i.e., the empirical models that predict the buying behavior of the underlying population facing the set of products and attributes included in each survey. To measure the incremental effect of the Images at Issue on Predicted Share of Preference among respondents, I included all eight competitors identified in Table 1 in the simulated markets, and I assigned each competitor my best estimate of its prevailing retail price at the relevant time in 2017 to 2018 (also shown in Table 1).  For each survey, I then conducted two simulations, one including the LifeProof products with the actual packaging and one with the respective alternative counter-factual. In each survey, the difference between a product's (FRE or SLAM) Predicted Share of Preference in the two simulations expressed as a percentage of its simulated share with the actual image is my best estimate of the effect of the incremental sales of the Products at Issue due to the Images at Issue. The standard error of this effect can be estimated using Sawtooth Software, and I use it throughout to gauge the statistical significance of findings.

83.      How well does the model capture the main drivers of phone-case purchasing among the respondents – product characteristics and price? To answer this question, I performed an internal validity check to assess how well does the model fit the data. I used the simulator to predict each respondent's estimated probability of choosing whichever option they actually chose in the first fixed task (see Table 2 for the product concepts in the first fixed task). This is a difficult task to predict because different consumers made different choices: 16.6% chose the first product, 27.2% chose the second product, 23.4% chose the third product, and 32.8% chose none of the products. A

---

[59] Zeithammer, R., & Lenk, P. (2009). Statistical Benefits of Choices from Subsets. *Journal of Marketing Research*, 46(6), 816–831; Zeithammer, R., & Lenk, P. (2006). Bayesian Estimation of Multivariate-Normal Models When Dimensions Are Absent. *Quantitative Marketing and Economics*, 4(3), 241–265.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

hit-rate of a random guess is thus 25 percent, and a hit-rate of a guess that just predicts the most popular option for everyone is 32.8 percent. In contrast, the hit-rate of the estimated HB-MNL model is 85 percent when we take each person's highest-estimated-probability option as their predicted choice. The average predicted probability of the chosen option is 73%, and the histogram of the predicted probabilities of the chosen option is highly skewed towards very high numbers (see **Exhibit 11**). In my 20 years of experience with conjoint analysis and choice modeling, this is very good performance from a choice model, and a demonstration that the model captures preference heterogeneity well.

84.    I also performed two external validity checks. The first asked: does the model estimate that consumers who bought a LifeProof product in the real world like the LifeProof brand more than consumers who have not? To answer this question, I rely on the concept of brand utility. Brand utility, sometimes also called "utility partworth," is one of the key outputs of conjoint analysis: the analysis effectively produces this measure of how much each person likes one brand relatively to other brands included in the survey. Sawtooth Software produces such partworth utility estimates for each LifeProof model included in the study (i.e., FRE and SLAM) as "Zero-Centered Diffs" specifically designed to be meaningfully compared across respondents.  I can thus define a respondent's "Utility of LifeProof" as the maximum estimated utility the respondent derives from the included LifeProof products (their versions in actual packaging), and check whether the model estimates a higher Utility of LifeProof among the consumers who bought a LifeProof product in the real world as compared to consumers who have not.   The answer is unequivocally "yes":  the Utility of LifeProof is indeed increasing in familiarity: from 50 among current users to 33 among former users, 31 among familiar non-buyers, and 22 among the unfamiliar respondents.

85.    The second external validity check I performed also relies on the differences in familiarity with the LifeProof brand, and checks whether LifeProof is a

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

premium brand in that users place less importance on price differences in their decision-making non-users. The Sawtooth Software produces individual-level estimates of importance weights, and the importance weight of price indeed decreases in familiarity with LifeProof: from 54% among the unfamiliar respondents to 41% among familiar non-buyers, to 31% among former users, to only 17% among current users. In other words: more than half of the purchasing decision among people unfamiliar with LifeProof is driven by price while less than a fifth of the purchasing decision among LifeProof owners is driven by price – LifeProof owners care most about product differences.

86.     Between the good fit to the data (internal validity check) and the prediction that the utility of LifeProof and the importance of product both increase in familiarity with LifeProof (two external validity checks), I conclude that the model is capturing the two main drivers of phone-case purchasing (product characteristics and price) well.

87.     Conjoint analysis and all my simulations effectively assume a level playing field among firms in terms of distribution and promotion.  In reality, firms have different distribution intensities and different promotion strategies at different times, and these differences affect firms' actual market shares. This difference explains why the simulated actual market shares of the products in Table 5 may differ from their actual market shares in 2017 or 2018. Since the two simulations (actual and alternative) hold everything other than LifeProof images constant, they are both affected in the same way by the differences between real-world markets and the level playing field in the survey. I assume this difference takes the form of a product-specific multiplier. Specifically, I assume the real and simulated shares satisfy:

$$RealShare_{FRE}(attributes) = M_{FRE} \times SimulatedShare_{FRE}(attributes)$$

$$RealShare_{SLAM}(attributes) = M_{SLAM} \times SimulatedShare_{SLAM}(attributes)$$

where the $M_{FRE}$ and $M_{SLAM}$ multipliers are some constants unknown to me, and where $attributes$ is a collection of all attribute levels of all products in the market. My main

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

method of attributing incremental sales calculates the Incremental sales due to the Images at Issue as the actual vs. alternative difference in simulated shares expressed as a percentage of the <u>simulated</u> share under actual images for the same product, effectively canceling out the multipliers as follows (where the $k$ subscript is a product):

$$Percentage\ incremental\ sales\ from\ simulations =$$

$$= \frac{SimulatedShare_k(actual\ image) - SimulatedShare_k(alternative\ image)}{SimulatedShare_k(actual\ image)} =$$

$$= \frac{\frac{RealShare_k(actual\ image)}{M_k} - \frac{RealShare_k(alternative\ image)}{M_k}}{\frac{RealShare_k(actual\ image)}{M_k}} =$$

$$= \frac{RealShare_k(actual\ image) - RealShare_k(alternative\ image)}{RealShare_k(actual\ image)} =$$

$$= Percentage\ incremental\ sales\ in\ reality$$

In other words, the mild constant-multiplier assumption common in the conjoint analysis literature[60] effectively allows me to calculate the percentage incremental sales without knowing the multipliers because the multipliers cancel out when I calculate the percentage. The resulting *Percentage Incremental Sales* metric is the workhorse of all my measurements outlined next.

88.　　The simulator operates at the individual level. Since different individuals report buying different amount of phone cases, I need to weigh people by purchase volume in calculating the population-level estimated market share. All my simulation use the same weighing scheme explained in detail in the section about sample selection and survey design.

89.　　The definitive measurement of the effect of the Images at Issue on the sales of the LifeProof products at issue is thus a pair of market simulations: one with the actual images on the package, and one with alternative images. For the SLAM product, only one

---

[60] E.g. Orme, B., & Johnson, R. (2006). External Effect Adjustments in Conjoint Analysis. In SAWTOOTH SOFTWARE CONFERENCE.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

alternative image is available. For the FRE product, I selected the better (for LifeProof sales) alternative image of the two options because this is what a competent brand manager would have done when deciding to deploy new packaging.[61] It turns out that the better alternative package for FRE (of the two tested) is the one without any images shown in Exhibit 4B. As explained earlier in this report, this is not surprising because this package design was actually carefully developed and used by LifeProof while the alternative design 4A was simply mocked up for the purposes of this project without extensive testing. When aggregating over individuals, both simulations weigh people by purchase volume as explained above.

90.     Sawtooth software provides an option to combine two products into a product line, and calculate the market share of the entire product line. This approach is useful in increasing precision of the estimate of interest (the sales of the entire product line) whenever the elements of the product line might be substitutes for each other as may be the case here. Table 5 shows the results of the market simulation. It is evident that the Images at Issue do not have a statistically significant effect on sales.  Specifically, the actual images increased the simulated market share of the LifeProof Product line compared to the alternative images by about 0.55 market share points, but this small increase is dwarfed by the standard error of 0.86 points[62]. The error around the resulting Percentage Incremental Sales of the LifeProof Product line (0.55/14.77, or 3.7%) is also dwarfed by its standard error of about 5.8%, making the estimate of Percentage Incremental Sales not statistically significant as it is not more than two standard errors from zero.

---

61 Managers in general routinely run conjoint analyses to select optimal package designs. LifeProof internal documents specifically indicate several package tests, e.g. "Packaging Eval. LifeProof Report". May 2018 by Molly Funkhouser and Robert Goldberg or "LifeProof Packaging". Quantitative research by Robert Goldberg, December 2019.

[62] Based on the standard t test, a difference has to exceed two standard errors to be significant.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

**Table 5: Simulation results: Testing Incremental sales due to Images at Issue**

| Product | Actual Images | | Alternative Images (mock SLAM, no image FRE) | | Incremental sales due to Images at Issue = Difference Actual-Alternative | | | |
|---|---|---|---|---|---|---|---|---|
| | Share points | SE | Share points | SE | Share points | SE | Percent of actual | SE |
| **LifeProof TOTAL** | **14.77%** | 0.64% | **14.22%** | 0.58% | **0.55%** | 0.86% | **3.72%** | 5.85% |
| **LP Fre** | **8.74%** | 0.49% | **8.20%** | 0.43% | **0.54%** | 0.65% | **6.18%** | 7.46% |
| **LP Slam** | **6.03%** | 0.31% | **6.01%** | 0.30% | **0.02%** | 0.43% | **0.33%** | 7.15% |
| Commuter | 17.17% | 0.55% | 17.15% | 0.55% | 0.02% | 0.78% | 0.12% | 4.53% |
| Symmetry | 14.13% | 0.41% | 14.18% | 0.41% | -0.05% | 0.58% | -0.35% | 4.10% |
| Check | 13.51% | 0.40% | 13.52% | 0.40% | -0.01% | 0.57% | -0.07% | 4.19% |
| Clear | 13.31% | 0.52% | 13.25% | 0.51% | 0.06% | 0.73% | 0.45% | 5.47% |
| Aqua | 8.86% | 0.38% | 9.10% | 0.38% | -0.24% | 0.54% | -2.71% | 6.07% |
| Catalyst | 8.00% | 0.34% | 8.26% | 0.35% | -0.26% | 0.49% | -3.25% | 6.10% |
| None | 10.24% | 0.86% | 10.33% | 0.86% | -0.09% | 1.22% | -0.88% | 11.88% |

91.     It is interesting to break down the above estimate by familiarity with LifeProof, and see whether the Images at Issue tend to attract existing customers or bring in new ones. Table 6 provides the results of such a segmentation. Not surprisingly given the lack of significance of the population-level estimates, the segment-level estimates are not significant either. But there is a distinct pattern whereby the effects are smaller in magnitude among consumers more familiar with the LifeProof brand. Looking at people not familiar with the brand, the Images at Issue can be polarizing: the FRE image (Dirtbiker) tested better relative to no image while the SLAM image (Running woman) seems to turn consumers away from SLAM relative to the alternative image on the mock package.

92.     Another segmentation of the respondents relevant to the dispute is according to the year the customer first purchased a LifeProof product, if ever. Table 7 shows the results of the simulations for both LifeProof as a whole and by product. The "All respondents" column repeats the information from Table 5. The "2018 and After" column then shows a remarkable consistency across the two LifeProof products: Of the simulated market share with actual images, about 3 percent (3.1% for FRE, 2.8% for

49

SLAM) was due to the Images at Issue, with both well within their standard errors and thereby not statistically significant.

**Table 6: Percentage Incremental Sales (Actual – Alternative), by familiarity with LifeProof brand. Alternative (alternative = mock SLAM, no image FRE).**

|  | *How familiar are you with the LifeProof brand of iPhone cases?* | | | | |
|---|---|---|---|---|---|
|  | All people | Currently using this brand | Bought it in the past, no longer use | Never bought it, but familiar | Not familiar |
| Number of people | 1025 | 214 | 193 | 183 | 435 |
| **LifeProof FRE** | **6.18%** | **4.15%** | **2.88%** | **11.58%** | **9.11%** |
| *Standard error* | *7.46%* | *8.98%* | *15.14%* | *19.1%* | *20.73%* |
| **LifeProof SLAM** | **0.33%** | **2.30%** | **8.07%** | **20.08%** | **-8.97%** |
| *Standard error* | *7.15%* | *10.43%* | *11.27%* | *22.44%* | *20.85%* |

**Table 7: Percentage Incremental Sales (Actual – Alternative), by first year of purchasing a LifeProof product. (alternative = mock SLAM, no image FRE)**

|  | All respondents (N=1025) | Before 2018 Buyer (N=132) | **2018 and After Buyer** (N=442) | Non Buyer (N=451) |
|---|---|---|---|---|
| LifeProof TOTAL | 3.72% | 4.76% | **3.01%** | 6.50% |
| *Standard error* | *5.85%* | *16.97%* | *6.22%* | *16.17%* |
| LP Fre | 6.18% | 10.73% | **3.15%** | 14.00% |
| *Standard error* | *7.46%* | *21.16%* | *8.16%* | *19.70%* |
| LP Slam | 0.33% | -8.40% | **2.85%** | -12.44% |
| *Standard error* | *7.15%* | *21.23%* | *7.77%* | *21.62%* |

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

## IX.    RESULTS: DIRECTION OF INCREMENTAL SALES DUE TO IMAGES AT ISSUE BASED ON MODEL-FREE MEASUREMENTS

93.    Table 8 shows the choice proportions of LifeProof products in Fixed Tasks 1 and 2, i.e. $89.99 FRE in competition with only $69.99 Otterbox Commuter and $79.99 Tech21 Aqua, and $69.99 SLAM in competition with only $59.99 Otterbox Symmetry and $49.99 Tech21 Clear (see Table 2 for details of the Fixed Task design). Recall that the Alternative FRE Image in Fixed Task 2 was the one shown in **Exhibit 4A**. The key comparison in Table 8 is the difference in LifeProof product choice proportions with the two images, i.e. simulated market shares in the sub-market involving only the two competitors noted above.

94.    One way to explain the larger effect for the SLAM product than for the FRE product is that the Actual vs. Alternative manipulation varies the central image on the package vs. merely varying the background image as in the FRE case. Note that unlike in the simulation-based estimate of the Incremental sales that uses the FRE package without images (the "ATT Pack" in **Exhibit 4B**), the alternative FRE package used in the model-free measurements uses the alternative image in **Exhibit 4A**. Another difference is the pricing of SLAM: the simulation-based estimate uses a lower and more realistic SLAM price than the one in the Fixed Tasks. The two results thus cannot be compared directly to each other.

95.    Table 8 shows that the actual image increases demand of FRE by 2.6 percentage points within the sub-market of {$89.99 LifeProof FRE, $69.99 Otterbox Commuter, $79.99 Tech21 Aqua}. This difference is statistically significant because the standard error of the within-person difference is 1.2 percentage points.[63] The table also

---

[63] I construct the within-subject measure as follows: for each respondent, I assign "+1" if they choose FRE with the Actual image but not with the Alternative image, "-1" if they choose FRE with the Alternative but not the Actual image, and "0" otherwise. The average of this measure is the effect shown in Table 8. The standard deviation of this measure across people divided by the square root of the number of subjects is the standard error of the effect.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

shows that the actual image increases demand SLAM by 5.2 percentage points within the sub-market {$69.99 LifeProof SLAM, $59.99 Otterbox Symmetry, $49.99 Tech21 Clear}. This difference is statistically significant because the standard error of the within-person difference is 1.2 percentage points.  The next paragraph interprets these numbers.

**Table 8: Model-free measurement of the Effect of Image at Issue on Demand (alternative = mock SLAM, mock FRE)**

|  | Weighted by purchase volume | | Unweighted | |
| --- | --- | --- | --- | --- |
|  | FRE | SLAM | FRE | SLAM |
| Actual | 19.0% | 16.4% | 16.6% | 14.0% |
| Alternative | 16.4% | 11.2% | 13.4% | 8.6% |
| Difference | **2.6%** | **5.2%** | 3.2% | 5.4% |
| Standard error | 1.2% | 1.2% | 1.1% | 1.1% |

96.     Unlike the definitive simulation-based measurement, this model-free analysis ignores the remaining conjoint tasks and the remaining competitors. The point of the model-free estimates is merely to illustrate the direction of the effect the definitive model captures more completely.  Based on the contrast between the simulation-based results in the previous section and the model-free results in the previous two paragraphs, I conclude that while the Images at Issue show a small positive directional impact for the LifeProof products, the effect diminishes to statistically indistinguishable from zero when the full competition is considered along with the complete data from all 20 choices each respondent made.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

## X.   RESULTS: SIDE-BY-SIDE DIRECT COMPARISON OF IMAGES IN TERMS OF LIKING

97.     Table 9 shows the distribution of responses to the direct side-by-side comparison questions. Recall that the Alternative Images in this task were the ones shown in **Exhibit 4**, i.e. the ones with an alternative images replacing the Images at Issue. Table 9 shows that – for either product – the respondents are polarized in their preferences, but they do not have a detectable directional preference for either image. No matter how one chooses to calculate the difference in liking of actual versus alternative images, the differences are not statistically significant.[64] Preferences for both the Actual and Alternative Images in this task seem stronger (i.e., fewer indifferent respondents) for the SLAM product, probably because the Actual vs. Alternative manipulation varies the central image on the package vs. merely varying the background image as in the FRE case.

98.     The results of this analysis show that once aware of the two different packages, respondents do not prefer one over the other. The analysis complements and reinforces my opinions expressed herein that use of L'Heureux's images did not have a statistically significant impact on Otter's sales of any accused products.

**Table 9: Answers to the side-by-side comparison questions (percent of respondents)**

| Product | Love Actual | Somewhat Prefer Actual | No preference | Somewhat prefer Alternative | Love Alternative |
|---|---|---|---|---|---|
| FRE | 13.6% | 12.8% | 50.8% | 9.9% | 13.0% |
| SLAM | 15.6% | 17.6% | 32.2% | 18.9% | 15.7% |

---

[64] The "Love Actual" vs. "Love Alternative" differences are 0.6% and -0.1% for FRE and SLAM, respectively, but the standard error of each measurement is about 1.1%, so the standard error of the difference is about 1.5%, double of which clearly exceeds the difference in magnitude (the effect-size would have to be double its standard error for significance at the standard 5% level). The analogous "Love or Somewhat Prefer" comparison differences are 3.5% and -1.5% with standard errors of 1.9% and 2.1%, and double of these effects is again more than the magnitude of the effects.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

# XI.     RESULTS: INVESTIGATION OF A POTENTIAL INDIRECT EFFECT VIA ONLINE INFORMATIONAL IMAGERY

99.      While I understand that the Plaintiff only included the accused images that were featured directly on the packaging of the accused products in its calculation of Otter's profits, I performed an additional analysis to test the impact of the use of Mr. L'Heureux's images in online informational imagery.  For this specific test, I used an image from the "carousel" on Amazon, as depicted at **Exhibit 7**, and compared it to an alternative image replacing Mr. L'Heureux's images as depicted in **Exhibit 8**. This analysis served as an additional check on the impact of the use of LHeureux's images on purchasing intention, and corroborated that there is no statistically significant impact. This analysis confirms that the Images at Issue do not have an indirect effect on purchasing of Images at Issue.

100.    Table 10 shows the distribution of responses to the purchase intent question, by the image used as reflected in Exhibits 7 and 8. It is immediately apparent that there is no difference between the actual and alternative image. To summarize the difference in a single number, I use the industry standard of "top two intentions", aggregating over "probably" and "definitely" will buy. The difference in the top two intentions is 0.39% with a standard error of 0.8% and hence not statistically significant.

**Table 10: Answers to the purchase intent questions (percent of respondents)**

| Image | How likely are you to purchase the product described above for $80? | | | | |
| | Definitely Will Not Buy | Probably Will Not Buy | Might / Might Not Buy | Probably Will Buy | Definitely Will Buy |
|---|---|---|---|---|---|
| Actual | 24.4% | 18.1% | 11.6% | 24.8% | 21.2% |
| Altern. | 24.1% | 17.4% | 13.0% | 25.4% | 20.2% |

101.    The results of this analysis complements and reinforces my opinions expressed herein that use of L'Heureux's images did not have a statistically significant impact on Otter's sales of any accused products.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

## XII.   CORROBORATING EVIDENCE FROM THE RECORD

102.     The record contains numerous pieces of evidence that the "look and feel" of L'Heureux's photographs did not positively impact sales.[65] In this section, I outline this evidence and relate it to the survey results whenever possible.

103.     Otter regularly surveys customers about their purchase intent – an antecedent of eventual sales. If the introduction of new package designs in the second half of 2017 had a large impact on consumer interest in LifeProof, we would observe an increase in purchase interest in early 2018 when the next measurement of intent was carried out. Instead, the 2018 Q2 Purchase interest was 21%, down from 22% in Q2 2017.[66] The slight year-on-year decline is not consistent with a large positive effect due to the Images at Issue. When I asked Alex Vats whether she remembers seeing any sales or intent or awareness jump attributable to the newly introduced packages involving the images at issue, she did not recall any such effect visible in the data available to her at the time.[67] So neither the consumer purchase intent data from the relevant time period nor managerial recollection of analyzing additional data offers any evidence that the "look and feel" of L'Heureux's photographs on LifeProof packages impacted consumer response throughout the purchase funnel (i.e. awareness, interest, intent, or sales).

104.     As outlined earlier in my report, there were many reasons to believe that the image-free "ATT Pack" alternative design for the FRE package would perform better than mock package with an alternative image. This is indeed what my conjoint survey found, adding to the evidence of external validity of my methodology. This finding also validates Otter's decision at the time to move towards packages with fewer or no images and larger windows showing the product.

105.     During the time relevant to the dispute, LifeProof also sold a product called NEXT, which featured a very similar lifestyle imagery, but did not use any images at

---

[65] For example, Complaint, at ¶¶ 69, 71.
[66] OP0005145 at -155
[67] Conversation with Alex Vats (Dec. 5, 2022)f

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

issue in the present dispute (see **Exhibit 11** for a side-by-side comparison of the NEXT package with the contemporaneous FRE package). I did not explicitly test the NEXT package, but consumer researchers at Otter did. Specifically, the May 2018 report on LifeProof packaging[68] shows that the NEXT package is between FRE and SLAM in terms of five of the six "Lifestyle Imagery Communication" metrics of package communication: engaging, inspiring, believable, relatable, and giving a positive view of LifeProof. The NEXT package continues to rest firmly in the middle of the pack even when we also consider the NUUD package. I conclude that the "look and feel" of L'Heureux's photographs (on the SLAM, FRE, and NUUD packages) did not make the respective packages stand out in terms of their ability to communicate the lifestyle of LifeProof brand: the photograph on the NEXT package does a comparable communication job across the board.

## XIII.  SUMMARY OF RESULTS

106.    As discussed above in Section VII, I tested the importance of package attractiveness to consumers.  The attractiveness of the packaging ranked lowest in both models I surveyed, leading to my conclusion that consumers consider the attractiveness of packaging to be the least important feature of all the thirteen features tested.

107.    As discussed above at Section VIII, I performed a conjoint analysis to model whether any use of the accused images cause any incremental sales in the marketplace.  The best point estimate of the incremental sales was only 3.7%, well within the margin of error, leading to my conclusion that there was no statistically significant impact on sales of products using the asserted imagery.

108.    As discussed at Section IX, I performed a model free analysis of a simulated submarket involving only two competitors.  This model showed a simulated

---

[68] Packaging Eval. LifeProof Report. May 2018 by Molly Funkhouser and Robert Goldberg (OP0004684).

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

impact of only 2.6% for FRE and 5.2% for SLAM, both of which were statistically significant, consistent with a small positive effect of the images of issue on sales.  Unlike the definitive simulation-based measurement outlined in the previous paragraph, the model-free analysis ignores most of the competitors, ignores the photo-free alternative package for FRE, and ignores most of the conjoint tasks. As explained in the previous paragraph, the effect diminishes to statistically indistinguishable from zero when the full competition is considered along with the complete data from all 20 choices each respondent made.

109.    As discussed in section X, I performed a side-by-side comparison of the actual and alternative packaging designs in terms of liking.  No matter how one chooses to calculate the difference in liking of actual versus alternative images, the difference are not statistically significant. In other words, the respondents did not like the actual images more than the alternative ones.

110.    As discussed in section XI, I performed an additional analysis testing the impact of Mr. L'Heureux's images in online informational imagery.  The simulated impact was only 0.4%, within the standard error of 0.8%, and therefore is not statistically significant.

111.    As discussed in section XII, the record does not include any evidence that the images at issue increased sales of the products at issue or that they communicated the lifestyle of the LifeProof brand better.

## XIV.  CONCLUSION

112.    I conducted a range of analyses to measure the incremental sales due to the Images at Issue. The definitive, most rigorous and reliable analysis is the volume-weighted simulation using conjoint analysis, which does not draw attention to packaging specifically and elicits preferences indirectly using simulated shopping – a task consumers are familiar with. The best point estimate of those results implied that

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

removing the Images at Issue from the packaging of LifeProof products (FRE and SLAM) would reduce the sales of the LifeProof product line by about 3.7 percent. The standard error of this estimate is about 5.8 percent, so this estimated reduction in sales is not statistically significant. The main effect of interest, if any, is thus so small that even a rigorous survey data on 20,000 consumer choices (1025 respondents x 20 tasks each) does not rule out the possibility that there is no effect at all.

113.    The remaining analyses I conducted corroborate the definitive measurement described in the previous paragraph, and provide convergent evidence about the small magnitude of the effect. The model-free results in Table 8 corroborate the existence of a small effect using a subset of the data and subset of the true competitors. In contrast to the definitive measurement discussed in the previous paragraph and its model-free companion, none of the other measurements I conducted show even a hint of an effect of the Images at Issue: consumers do not like the images more than the alternatives (Table 9), they do not respond with increased purchase intent when the images appear online informational imagery (Table 10), and they consider the attractiveness of packaging the least important feature when it comes to shopping for phone cases from  all the features we measured (Table 3).

114.    Given the convergent evidence from all five different analyses I conducted, my conclusion is that there are no acceptable statistical grounds for attributing any of the sales and, hence, profits of the Products at Issue to the Images at Issue. The evidence available in the record agrees with this conclusion.

115.    My surveys focused on iPhone users in order to show actual packages with products intended for iPhones. Since the packages at issue for Samsung and other brands of phones looked identical except for the "for iPhone" label or otherwise featured L'Heureux images that Plaintiff asserts had a consistent "look and feel", my opinion extends to all other brands of phones. Since iPhones tend to be the most expensive phones on the market, focusing on them is conservative in that iPhone buyers are most

58

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

likely to have the disposable income for also buying a LifeProof case which tended to be one of the most expensive cases on the market at the time relevant to the case.

116.     The conjoint analysis focused on two Images at Issue. The complementary analysis of online informational images focused on three other Images at Issue. Based on Plaintiff's assertions that Otter exploited the "consistent image conveyed by L'Heureux's photography to create a feeling among consumers that makes them feel at-home and a part of the outdoor and extreme sports lifestyle"[69], my opinion extends to any photography taken by Mr. L'Heureux for Otter. For analogous reasons, my opinion extends to the NUUD product line not explicitly considered in my surveys.

Executed on December 8, 2022 in Los Angeles, California.

Robert Zeithammer, Ph.D.

---

[69] Complaint, at ¶ 69.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

## EXHIBIT 1: INTRODUCING FEATURES FOR BEST-WORST SURVEY

### Drop protection



Description: The phone case includes parts made of shock-absorbent material (like silicone or rubber), and the overall design is tested to protect the phone during drops from several feet.

### Waterproof



Description: The phone case is designed to keep the phone dry when submerged several feet deep in water for an hour.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

**Dirt protection**



Description: The phone case is sealed to keep dirt and dust out.

**Durable**



Description: The case is durable, and guaranteed to protect your phone for at least a year from purchase.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

**Stylish**



Description: <u>You</u> consider the phone case design to be stylish.

**Good brand**

  

 

Description: the case is made by a brand <u>you</u> consider to be good and reliable. Some popular brands are shown above as illustrations, but <u>only you</u> know which of them (or perhaps another brand not shown here) you consider to be good.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

**Thin**

 

Description: the phone case is slim, barely adding to the bulk of the phone it protects.

**Attractive packaging box**

  

Description: the phone case is sold in attractive packaging. Some examples of phone case packaging boxes are shown above.

**Sturdy packaging box**



Description: the phone case is sold in sturdy packaging, which protects the case well both on a store shelf and during shipping. No need to handle with care...

**Affordable**



Description: phone case seems affordable to you.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

**Colorful**



Description: the phone case comes in a range of colors.

**Innovative**



Description: the phone case is innovative.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

**High quality**



Description: the phone case is well made and of overall high quality.

**EXHIBIT 2: SAMPLE BEST-WORST SCALING TASK**

Imagine you are shopping for a new case for your iPhone.

Considering only the FOUR features of phone cases shown below, which is the <u>Most Important</u> and which is the <u>Least Important</u> to you?

(1 of 14)

| Most Important | | Least Important |
|:---:|:---:|:---:|
| ◯ | innovative | ◯ |
| ◯ | thin | ◯ |
| ◯ | high quality | ◯ |
| ◯ | attractive packaging box | ◯ |

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

**EXHIBIT 3: ACTUAL PACKAGE DESIGNS**




EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

**EXHIBIT 4A: COUNTER-FACTUAL PACKAGE DESIGNS**





EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

**EXHIBIT 4B: ACTUAL PACKAGE DESIGN WITHOUT IMAGES**



EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

**EXHBIT 5: ATTRIBUTE INTRODUCTION PAGE**

PRODUCT AND SHOPPING TASK INTRODUCTION

This survey will present you with a range of protective cases for your iPhone, describing each product using the following features:

Product features:

**Brand**: Catalyst, LifeProof, Otterbox, and Tech21

**Product details**: described by a photo of package

**Type of protection**: list of main features of the case

**Price**: ranging from $39.99 to $89.99

Shopping task:

Imagine you are shopping for a new case for your iPhone, and the store or website you visit only carries three products. On the next screen, please indicate which, if any, of the three products you would buy.

**EXHIBIT 6: SAMPLE CONJOINT TASK**

If these were your only options, which would you choose? (assume all the cases shown are available for your specific iPhone model)

(1 of 20)



water proof

dirt proof

snow proof

drop proof

**$59.99**

Select



drop proof

**$69.99**

Select



drop protection

sleek protection

**$39.99**

Select

NONE OR OTHER:

I wouldn't choose any of these. Instead, I would buy a different brand or not buy any protective case at all.

Select

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

**EXHIBIT 7: ONLINE INFORMATIONAL IMAGE, ACTUAL**



EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

**EXHIBIT 8: ONLINE INFORMATIONAL IMAGE, COUNTER-FACTUAL**



EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

**EXHIBIT 9: PURCHASE INTENT QUESTION**



Imagine you are shopping for a protective case again.
How likely are you to purchase the product described above for $80?

| Definitely Will Not Buy | Probably Will Not Buy | Might / Might Not Buy | Probably Will Buy | Definitely Will Buy |
|---|---|---|---|---|

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

**EXHIBIT 10: DIRECT SIDE-BY-SIDE PACKAGE LIKING QUESTION**



EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

**Exhibit 11: NEXT PACKAGE NEXT TO FRE PACKAGE**



EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

## APPENDIX 1: CURRICULUM VITAE (INCLUDES LIST OF PUBLICATIONS AND TESTIMONY)

Attached as a separate document

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

## APPENDIX 2: LIST OF MATERIALS REVIEWED

**Materials provided by counsel:**

OP0004561

OP0004684

OP0004719

OP0004756

OP0005067

OP0005100

OP0005145

OP0005217

OP0005281

OP0005333

OP0005383

OP0005419

OP0005465

OP0005521

OP0005541

OP0005560

OP0012215

OP0012216

OP0012217

OP0012218

OP0012219

OP0012220

OP0012221

OP0012222

OP0012223

OP0012224

OP0012225

OP0012226

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

OP0012227

OP0012228

OP0012229

OP0012230

OP0011073

CAPTURE_0009699

CAPTURE_0010146

CAPTURE_0010157

CAPTURE_0010159

CAPTURE_0010336

CAPTURE_0010340

CAPTURE_0010377

CAPTURE_0010387

CAPTURE_0010392

CAPTURE_0010397

CAPTURE_0010403

First Amended Complaint and attached Exhibits

12/3/2020 Defendants' Responses to Plaintiffs' First Set of Interrogatories

4/1/2021 Defendants Responses to Second Interrogatories

8/3/2021 Defendants' Supplemental Response to Interrogatory Nos. 3 and 4

11/17/2021 Defendants' Supplemental Response to Interrogatory No. 4

6/10/2021 Hoskins' Responses to Otter's First Interrogatories

12/21/2020 Plaintiff's Responses to Defendants' First Interrogatories

3/19/2021 Plaintiff's Answers to Requests for Admission

3/19/2021 Plaintiff Answers and Objections to Second Set of Interrogatories

4/23/2021 Plaintiff's Supplemental Response to Interrogatory No. 3


**Academic articles and chapters**

Shu, S. B., Zeithammer, R., & Payne, J. W. (2018). The Pivotal Role of Fairness: Which Consumers Like Annuities? Financial Planning Review, 1(3-4), e1019

Shu, S. B., Zeithammer, R., & Payne, J. W. (2016). Consumer Preferences for Annuity Attributes: Beyond Net Present Value. Journal of Marketing Research, 53(2), 240–262

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

Zeithammer, R., & Kellogg, R. P. (2013). The Hesitant Hai Gui: Return-Migration Preferences of U.S.-Educated Chinese Scientists and Engineers. Journal of Marketing Research, 50(5), 644–663

Zeithammer, R., & Lenk, P. (2009). Statistical Benefits of Choices from Subsets. Journal of Marketing Research, 46(6), 816–831

Zeithammer, R., & Lenk, P. (2006). Bayesian Estimation of Multivariate-Normal Models When Dimensions Are Absent. Quantitative Marketing and Economics, 4(3), 241–265.

Louviere, J. J., Flynn, T. N., & Marley, A. A. J. (2015). Best-worst scaling: Theory, methods and applications. Cambridge University Press. Flynn, T. N., & Marley, A. A. (2014). Best-worst scaling: theory and methods. In Handbook of choice modelling (pp. 178-201). Edward Elgar Publishing.

Van Schoubroeck, S., Chacon, L., Reynolds, A. M., Lavoine, N., Hakovirta, M., Gonzalez, R., ... & Venditti, R. A. (2023). Environmental sustainability perception toward obvious recovered waste content in paper-based packaging: An online and in-person survey best-worst scaling experiment. Resources, Conservation and Recycling, 188, 106682.

Thong, N. T., Thanh, B. Q., Solgaard, H. S., & Yang, Y. (2018). The role of packaging format, alcohol level and brand in consumer's choice of beer: a best-worst scaling multi-profile approach. Food quality and preference, 65, 92-100.

Lenk, P. J., DeSarbo, W. S., Green, P. E., & Young, M. R. (1996). Hierarchical Bayes conjoint analysis: Recovery of partworth heterogeneity from reduced experimental designs. Marketing Science, 15(2), 173-191.

Wittink, D. R., & Cattin, P. (1989). Commercial Use of Conjoint Analysis: An Update. Journal of Marketing, 53(3), 91–96; Toubia, O. (2018). Conjoint Analysis. In Handbook of Marketing Analytics. Cheltenham, UK: Edward Elgar Publishing.

Green, P. E., Krieger, A. M., & Wind, Y. J. (2001). Thirty Years of Conjoint Analysis: Reflections and Prospects. Interfaces, 31(3 Supplement), S56–S73.

Agarwal, J., DeSarbo, W. S., Malhotra, N. K. & Rao, V. R. (2015). An Interdisciplinary Review of Research in Conjoint Analysis: Recent Developments and Directions for Future Research. Customer Needs and Solutions, 2(1), 19-40.

Ben-Akiva, M., McFadden, D., & Train, K. (2019). Foundations of Stated Preference Elicitation: Consumer Behavior and Choice-based Conjoint Analysis. Foundations and Trends in Econometrics, 10(1-2), 1–144.

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

Oppenheimer, D. M., Meyvis, T., & Davidenko, N. (2009). Instructional manipulation checks: Detecting satisficing to increase statistical power. Journal of Experimental Social Psychology, 45(4), 867-872.

Allenby, G. M., Brazell, J., Howell, J. R., & Rossi, P. E. (2014). Valuation of Patented Product Features. Journal of Law and Economics, 57(3), 629-663

**Other documents**

Orme, B. (2009). Which conjoint method should I use? Sawtooth Software Research Paper Series, 1-6.

Orme, B., & Johnson, R. (2006). External Effect Adjustments in Conjoint Analysis. In SAWTOOTH SOFTWARE CONFERENCE.

Toubia, O. (2018). "Conjoint Analysis". In Handbook of Marketing Analytics. Cheltenham, UK: Edward Elgar Publishing.

George Derpanopoulos, Ph.D. et. al., The Use of Conjoint Analysis in High-Stakes Litigation: A Historical Review Up to Navarro et. al., v. Procter and Gamble, Which Withstood A Rigorous Daubert Challenge, 102 J. Pat. & Trademark Off. Soc'y 502 (2022).

Lang, M. (2011). Conjoint Analysis in Marketing Research: Fundamentals–Methods–Applications–Critical Assessment. Munich: GRIN Verlag.

 re Dial Complete Marketing & Sales Practices Litigation, 320 F.R.D 326 (D.N.H. 2017)

Broomfield v. Craft Brew Alliance, Inc., Case No. 17-cv-01027, 2018 U.S. Dist. LEXIS 177812 (N.D. Cal. Sept 25, 2018)

Schneider v. Chipotle Mexican Grill, Inc., 328 F.R.D. 520 (N.D. Cal. 2018)

Fitzhenry v. Dr. Pepper Snapple Grp. Inc., 326 F.R.D. 592 (N.D. Cal. 2018)

Cameron, L., Cragg, M., & McFadden, D. (2013). The Role Of Conjoint Surveys In Reasonable Royalty Cases. Law360.

Rao, V. R. (2011). Applied Conjoint Analysis, New York, NY: Springer

Zeithammer, R., & Tomlin, J. (2018). Product Labeling Class Actions - Identifying the 'Con' in Conjoint Surveys. Bloomberg Law

Townsend v. Monster Beverage Co., Case No. 5:12-cv-02188, Order Denying in Part and Granting in Part Defendants' Motion to Strike Stefan Boedeker's Expert Report and Testimony (C.D. Cal. Dec. 20, 2018)

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.

ResearchLive, (2019). Research Now SSI Rebrands to Dynata.

Diamond, S. S. (2011). Reference Guide on Survey Research. In Federal Judicial Center / National Academy of Science (Eds.), *Reference Manual on Scientific Evidence* (3rd ed., pp. 359-424). Washington, DC: The National Academic Press, p. 376.

Orme, B. (2010). Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research (2nd ed.). Madison, WI: Research Publishers LLC, p. 127.

**Web documents**

https://sawtoothsoftware.com/resources/technical-papers/maxdiff-technical-paper

https://macsources.com/lifeproof-fre-iphone-7-case-review/

https://www.imore.com/lifeproof-slam-iphone-case-protection-without-major-bulk

https://www.androidheadlines.com/2017/05/otterbox-commuter-series-galaxy-s8-s8-plus-review.html

https://www.macobserver.com/reviews/quick-look/review-special-otterbox-clear-case-iphone-x/

https://appadvice.com/products/guides/iphone-8-cases/754204

https://www.macworld.com/article/229850/12-cases-that-will-look-fabulous-on-your-new-red-iphone-7.html

https://www.popsugar.com/smart-living/Best-Waterproof-Phone-Cases-2017-43569055#photo-43569075 (May 25, 2017)

https://innovation.nielsen.com/products-for-the-new-normal

https://www.ashokcharan.com/Marketing-Analytics/~pv-BASES.php

EXPERT REPORT OF ROBERT ZEITHAMMER, PH.D.