Exhibits to the Declaration of James Beard

# Exhibit B

Restricted Copy

www.aptusCR.com  |  866.999.8310

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF COLORADO

 3                          --o0o--

 4   THE CAPTURE ELEVEN      )
     GROUP, a California     )
 5   corporation,           )
                            )
 6       Plaintiff,         )
                            )
 7            vs.           ) No. 1:20-CV-02551-CNS-KLM
                            )
 8   OTTER PRODUCTS, LLC, a  )
     Colorado limited       )
 9   liability company; and )
     TREEFROG DEVELOPMENTS,  )
10   INC., a Delaware       )
     corporation,           )
11                          )
         Defendants.        )
12   _____ )

13

14           VIDEOCONFERENCE DEPOSITION OF

15                    GARY ELSNER
     _____
16                  Naples, Florida

17

18

19   Date:   Thursday, February 2, 2023

20   Time:   8:26 a.m. EST

21   Reporter:  Renee Combs Quinby, RDR, CRR, CSR #11867

22   Job No.: 10113622

23

24

25
```

Case 1:20-cv-02551-SKC-KAS Document 222 Filed 02/27/23 USDC Colorado Page 4 of 31

```
 1                  REMOTE APPEARANCES

 2


 3    FOR THE PLAINTIFF:

 4         Howard N. Wisnia, Esq.
           Wisnia PC
 5         12636 High Bluff Drive, Suite 400
           San Diego, CA  92130
 6         (858)461-0989
           howard@wisnialaw.com
 7


 8


 9    FOR THE DEFENDANTS:

10         James W. Beard, Esq.
           Merchant & Gould, P.C.
11         1801 California Street, Suite 3300
           Denver, CO  80202
12         (303)357-1670
           jbeard@merchantgould.com
13


14


15    APTUS MONITOR:  Chris Landrum

16

17

18

19

20

21

22

23

24

25
```

Gary Elsner

The Capture Eleven Group vs.
Otter Products, LLC

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF COLORADO

 3                          --oOo--

 4   THE CAPTURE ELEVEN        )
     GROUP, a California       )
 5   corporation,             )
                              )
 6        Plaintiff,           )
                              )
 7        vs.                  ) No. 1:20-CV-02551-CNS-KLM
                              )
 8   OTTER PRODUCTS, LLC, a    )
     Colorado limited          )
 9   liability company; and    )
     TREEFROG DEVELOPMENTS,    )
10   INC., a Delaware          )
     corporation,             )
11                            )
          Defendants.         )
12   _____ )

13                          --oOo--

14          VIDEOCONFERENCE DEPOSITION OF GARY ELSNER,

15   produced, sworn, and examined on Thursday, February 2,

16   2023, with the witness appearing via videoconference

17   from Naples, Florida, taken on behalf of the

18   Plaintiff, before RENEE COMBS QUINBY, a California

19   Certified Shorthand Reporter #11867, Registered

20   Reporter, Certified Realtime Reporter, and a Realtime

21   Systems Administrator.

22

23

24

25
```

Case No. 1:20-cv-10254-KNG-KAS    Document 122    Filed 02/28/23    USDC Colorado    Page 6 of 31

**Gary Elsner**

**The Capture Eleven Group vs.
Otter Products, LLC**

```
 1                        --oOo--

 2              IT IS HEREBY STIPULATED AND AGREED by and

 3     between counsel for the Plaintiff and counsel for the

 4     Defendants that this deposition may be taken in

 5     machine shorthand by RENEE QUINBY, RDR, CRR, Certified

 6     Shorthand Reporter and Certified Court Reporter, and

 7     afterwards transcribed into typewriting.

 8                        --oOo--

 9                    GARY ELSNER,

10     of lawful age, having been first duly sworn to testify

11     to the truth, the whole truth, and nothing but the

12     truth in the case aforesaid, deposes and says in reply

13     to oral interrogatories propounded as follows, to-wit:

14                        --oOo--

15           P R O C E E D I N G S   8:26 a.m. EST

16                    EXAMINATION

17     BY MR. WISNIA:

18          Q.   Good morning, sir.  I'm Howard Wisnia.  Nice

19     to meet you.

20          A.   Nice to meet you, Howard.

21          Q.   All right.  Will you kindly state your full

22     name and your current business address.

23          A.   Gary Elsner.  That's E-l-s-n-e-r.  The

24     address is 6111 Wedge Court, W-e-d-g-e Court, Naples,

25     Florida 34113.
```

```
 1        A.   No, sir.
 2        Q.   All right.  But aside from that, has your
 3   entire professional career been in photography?
 4        A.   I'm sorry.  Please repeat that a little more
 5   slowly so I can make sure I get it right.
 6        Q.   Besides your time in the Service, has your
 7   entire career been in photography?
 8        A.   Yes, sir.
 9        Q.   What -- what sparked your interest in
10   photography?  Why have you decided to make it your --
11   your career?
12        A.   Well, in my senior year of high school, I
13   had transferred from one school to another and, as a
14   result, I had very few requirements left to accomplish
15   my degree, and so I took a part-time job in Manhattan.
16   And through a state employment agency, I found myself
17   working for a stock photography agency that at that
18   time was called Freelance Photographers Guild.
19        Q.   What is stock photography?
20        A.   Stock photography is a portion of the
21   commercial photography business involved in the
22   licensing of images that were either speculatively
23   created by photographers in order to license them or
24   they were the -- the images are the byproducts of
25   assignments that the copyright holder, the
```

1   specialty?

2         A.   Well, when they first performed, they only

3   had black-and-white and color contemporary

4   photography, and then they started acquiring other

5   collections and broadened the collections that they

6   represented --

7         Q.   **All right.**

8         A.   -- the type of images.

9         Q.   **In your role at FPG, did you draft license**

10  **agreements?**

11        A.   At what point in time, sir?

12        Q.   **Well, any time.  Let's start there.**

13        A.   Yes.

14        Q.   **What years did you draft license agreements?**

15        A.   When you -- I think your terminology is

16  inappropriate for the industry.  I created licensing

17  agreements that concluded a transaction in which we

18  were licensing an image to a buyer, okay?  So that's

19  the proper terminology.  And I would say up to

20  probably 19- -- probably 1997, I personally -- as part

21  of my job, I personally created licenses for imagery.

22        Q.   **When you say you created a license, does**

23  **that mean that you negotiated the actual terms of the**

24  **agreement?**

25        A.   Yes, sir.

1  instances, we did an asset purchase.  In other

2  instances, we purchased the company in its entirety,

3  including taking over the employees and the financial

4  responsibilities associated with those employees.

5  BY MR. WISNIA:

6  **Q.   Okay.  Have you ever been -- been an**

7  **assignment photographer?**

8  A.   I've already testified that I've never

9  licensed any of my photos.  The answer is no.

10  **Q.   Okay.  Have you ever commissioned an**

11  **assignment for an assignment photography project?**

12  MR. BEARD:  Objection.  Vague.

13  THE WITNESS:  When you say "commission," are

14  you talking about basically hiring a photographer to

15  perform an assignment?  Is that what you're saying?

16  BY MR. WISNIA:

17  **Q.   Sure.  We can start there.**

18  A.   Okay, fine.  Yes, I have.

19  **Q.   When did you do that?**

20  A.   I did it numerous times during the course of

21  my career while employed with FPG.

22  **Q.   So you would do assignment photography at**

23  **FPG, or you're talking about stock photography?**

24  A.   No.  Assignment photography.  I answered

25  your question.

1     Q.   So give me --

2     A.   It's one of the products FPG offered.

3     Q.   Which was what, sir?

4     A.   To provide assignment photography.  In the

5  sense that one of our clients -- let's be clear.  One

6  of our clients would call me up and say, Gary, I need

7  to have an image taken of a downhill skier.  Do you

8  have somebody that can do this for us?  And I would

9  say, Sure.  Give me some more information.  And I

10  would get the information.

11          I would then provide the client with samples

12  or a portfolio of the particular photographer that I

13  think would be best suited in every way for the job

14  that was required.

15          And then the client would make a decision,

16  Well, yeah, I want to use this guy.  How much is it

17  going to cost me?

18          I would then have a further conversation

19  with him to get total clarity on exactly what was

20  involved.  And then as a middleman, as an agent that

21  we were, I would get on the horn with the photographer

22  and say, Okay, here's what we've got going.

23          And on assignment, we had a contract that

24  dealt with commission splits on stock image licensing.

25  But on assignments, the contract called for us to

**Gary Elsner**

```
 1   negotiate that separately based on a case-by-case
 2   basis.
 3          Then I would basically say, Okay, Tom,
 4   here's what required -- what's your day rate going to
 5   be?  Let's talk about the use fee and so on and so
 6   forth.
 7          I'd come up with the numbers and go back to
 8   the client and say, Okay, let's -- for simplicity,
 9   let's assume it's a one-shot thing.  All right.  The
10   cost for the assignment is going to be X number of
11   dollars for the creative and, based on the usage
12   information, the following is what the licensing fee
13   would be for a total of X dollars.
14          And I would either get approval or there may
15   be a negotiation or whatever, but that would be the
16   essence of the transaction and my role in that
17   transaction.
18   Q.   So you were acting as an agent?
19   A.   Our company was acting as an agent, and I
20   was acting on behalf of my company as an employee of
21   the company to -- as the facilitator, you know,
22   whatever you want to call it, yes.
23   Q.   I mean, did FPG employ agents?
24          MR. BEARD:  Objection.  Vague.
25          THE WITNESS:  What do you mean by "agents"?
```

1     Q.   So Mr. Kirby told you that their

2   understanding was that they would have non-exclusive

3   rights under the -- under the pictures?

4          MR. BEARD:  Objection.  Vague.  Calls for a

5   legal conclusion.

6          THE WITNESS:  It was my -- it's my

7   understanding that at no time was exclusivity an issue

8   or a topic.  It certainly wasn't indicated on any of

9   Mr. L'Heureux's invoices either during the initial ICA

10  period or during any of the ensuing things.

11         And as we all know, Mr. L'Heureux did

12  license one of the images to a third party and, to my

13  knowledge, there was absolutely no pushback.  I think

14  there would have been a pushback if Mr. L'Heureux

15  licensed it to a competing company that produced cell

16  phone and other electronic product covers, but to my

17  knowledge, that was never the case.

18  BY MR. WISNIA:

19    Q.   My understanding of your opinion is that

20  during the ICA period, before it was terminated, there

21  was a work-for-hire provision and, therefore, all the

22  pictures that Mr. L'Heureux took were exclusively

23  owned by Otter.  Is that your understanding?

24    A.   That's my understanding, yes.

25         MR. BEARD:  Objection.  Calls for a legal

1    speculation.

2            THE WITNESS:  The understanding as far as

3    what?

4    BY MR. WISNIA:

5        **Q.   On the question of whether or not Otter**

6    **would have exclusivity for some period of time for use**

7    **of their -- for use of the photographs on their**

8    **packaging.**

9        A.   Again, as I stated earlier, I don't see how

10   I can speak to intent in this situation.  I did not

11   ask that question directly of either Mr. L'Heureux or

12   anyone at Otter or affiliated with Otter.

13           Again, I state what is standard in the

14   industry, and as you yourself in your question -- in

15   the prior questions have pointed out, it would be

16   absolutely absurd to allow or agree to allow a

17   photographer to take images that maybe cost the client

18   hundreds of thousands of dollars to produce that would

19   allow that photographer to then turn around and

20   license those images competitively to somebody else

21   that's a competitor of the assignment client.

22       **Q.  Do you have an understanding as to whether**

23   **or not there was any sort of agreement -- and I don't**

24   **mean written -- any sort of meeting of the minds, so**

25   **to speak, between Mr. L'Heureux and Otterbox or Otter**

**Gary Elsner**

1   related to how these photographs that Mr. L'Heureux

2   took after the termination of the ICA would be used on

3   packaging, exclusivity, non-exclusivity, a certain

4   period of time of exclusivity, a field of use

5   exclusivity?  Any thoughts on that?

6           MR. BEARD:  Objection.  Calls for

7   speculation.

8           THE WITNESS:  Again, I can't speak to

9   intent, because at no time was I given the opportunity

10  to speak to these gentlemen at the time these shoots

11  were produced.

12          I can, as I did in my report, look at the

13  licensing invoices and opine as it would relate to

14  standard practice and business standards in the

15  industry of commercial photography for the licensing.

16  And to that regard, there were absolutely no

17  restrictions placed on those license invoices that

18  were issued, as I discussed and clarified in my

19  report.

20  BY MR. WISNIA:

21      Q.   I appreciate the answer, but I'm asking a

22  slightly different question.  You may have answered it

23  by saying you don't have any information on intent,

24  but I just want to be clear.

25          Do you have an opinion as to whether or not

Gary Elsner

1    Mr. L'Heureux and Otter were on the same page?  Was

2    there some sort of meeting of the minds as to

3    exclusivity or non-exclusivity with respect to these

4    post-ICA photo shoots?

5             MR. BEARD:  Objection.  Calls for a legal

6    conclusion.  Speculation.

7             THE WITNESS:  Again, you're speaking toward

8    the intent, which I cannot opine on.  I can offer, as

9    I have in my report, my opinion as to what the outcome

10   was by the nature of exactly how the transactions were

11   conducted on the licensing invoices.

12            MR. WISNIA:  Okay.  Thank you, sir.  We've

13   been going a little bit more than an hour.  Why don't

14   we take a break.  Let's go off the record.

15            (Recess taken.)

16   BY MR. WISNIA:

17       Q.   Sir, you understand you're still under oath?

18       A.   Yes, sir.

19       Q.   Okay.  I want to look in your report at

20   paragraph 44.  Well, let me back up for a second.

21            At paragraph 31, you have a heading about

22   assignment photography.

23       A.   Yes, sir.  I'm there.

24       Q.   Okay.  And then you have a description of

25   assignment photography.

BY MR. WISNIA:

    Q.   Okay.  And you're aware that that's also what Mr. L'Heureux thought?

           MR. BEARD:  Objection.  Facts, foundation.

           THE WITNESS:  I -- you're asking me to speak to intent, and I've never spoken to really either party, but specifically Mr. L'Heureux, in terms of what his understanding was specifically related to the ICA period.  I can draw conclusions regarding the post-ICA period based on litigation, but, again, that conclusion -- I have no firsthand knowledge.

BY MR. WISNIA:

    Q.   Okay.  L'Heureux submitted a declaration in this case as well, and he was deposed.  You reviewed those things by Mr. L'Heureux, correct?

    A.   Yes, sir.

    Q.   Okay.  So whether you agree with him or not, it's your understanding, based on reading those documents, that Mr. L'Heureux thought that he had the same deal that Oldfield thought that they had?

           MR. BEARD:  Objection.  Speculation --

           THE WITNESS:  I --

BY MR. WISNIA:

    Q.   Before and during the ICA is the period I'm talking about.

```
 1   through Google.
 2        Q.   Well, I'm not sure exactly how it was done,
 3   but I think it was not far off.
 4             MR. BEARD:  Objection.  Calls for
 5   speculation.
 6   BY MR. WISNIA:
 7        Q.   But I can't speak specifically to it.  I
 8   mean, for example, take a look in paragraph 2.
 9        A.   Yeah.
10        Q.   Do you see there's a sentence towards the
11   bottom that says, (quote as read):
12                  Company will provide a laptop to
13                  independent contractor to be used
14                  under the terms of this agreement?
15        A.   Yes.
16        Q.   Do you know if that was done?
17             MR. BEARD:  Objection.  Calls for
18   speculation.
19             THE WITNESS:  I have no clue.
20   BY MR. WISNIA:
21        Q.   I mean, in the industry, is that the type of
22   thing you would do with an assignment photographer,
23   you would give them a laptop?
24             MR. BEARD:  Same objection.
25             THE WITNESS:  I have no way of knowing.
```

Gary Elsner

```
 1   BY MR. WISNIA:
 2        Q.   You don't know if that's typical in the
 3   industry for -- in an assignment photography
 4   relationship, you give the photographer a laptop?
 5             MR. BEARD:  Objection.  Vague.
 6             THE WITNESS:  It would -- I'd have to come
 7   to a conclusion, but this is the first time I've seen
 8   that in an assignment agreement.
 9   BY MR. WISNIA:
10        Q.   Okay.
11        A.   Or a licensing agreement, I should call it.
12        Q.   Okay.  If you take a look in your report,
13   sir, at page -- excuse me, paragraph 50, starts on
14   page 16.
15        A.   I'm there.
16        Q.   There's a heading called Business Practices
17   for Assignment Photographs.
18        A.   Yes, sir.
19        Q.   Where does the information in this section
20   come from?
21        A.   My more than 50 years of work in the
22   commercial photography industry.
23        Q.   And post-ICA, do you have any information
24   one way or the other whether or not L'Heureux and
25   Otter had an initial meeting where Otter spelled out
```

Case 1:20-cv-02553-NLH-KM Document 221-5 Filed 02/27/25 Page 19 of 31

```
 1   what their needs were and what the end use would be
 2   for the photos to be produced?
 3            MR. BEARD:  Objection.  Speculation.
 4            THE WITNESS:  I have no way of knowing
 5   whether that meeting occurred.
 6   BY MR. WISNIA:
 7        Q.   You have a -- a heading or a bullet towards
 8   the bottom of the page.  It's the
 9   second-from-the-bottom bullet.
10        A.   Yes.
11        Q.   And in there, you write, (quote as read):
12                 In the absence of separate contract
13                 governing and controlling the
14                 business dealings between the
15                 parties or a discrete licensing
16                 document accompanying delivery of
17                 the images, the invoice is, in
18                 fact, the license that would convey
19                 the terms of use and would include
20                 any restrictions of the use of
21                 images produced on the assignment.
22            Do you see that?
23        A.   Yes, sir, I do.
24        Q.   What's the basis for your understanding of
25   that?
```

Case 1:20-cv-02551-SKC-KAS Document 52-1 Filed 02/28/23 USDC Colorado Page 20 of 31

The Capture Eleven Group vs.
Otter Products, LLC

Gary Elsner

```
 1        A.    More than 50 years of licensing experience
 2   in the commercial photography industry as it relates
 3   to both licensing of assignment images as well as
 4   stock images.
 5        Q.    Okay.  Your experience has been with respect
 6   to assignment photography as a middleman, so to speak,
 7   right?
 8             MR. BEARD:  Objection --
 9             THE WITNESS:  That's only one aspect of my
10   experience in the assignment industry.
11   BY MR. WISNIA:
12        Q.    Okay.  Have you not -- have you -- what is
13   your other aspect of being not a middleman with
14   respect to assignment photography?
15        A.    Well, as I believe I testified earlier, my
16   experience involves actually being an art director on
17   actual assignments.
18             I have further experience in providing
19   consulting services to assignment photographers as it
20   relates to their business practices, their documents
21   and their dealings on assignment as well as, in some
22   cases, pricing both from the standpoint of the initial
23   estimate as well as the final licensing invoice as
24   well as subsequent licensing of images that were
25   originally created on assignment.
```

**Gary Elsner**

1    I also have significant experience dealing

2   with assignment photographers from the standpoint of

3   my expert work.  I have done everything from, as in

4   this case, opining on disputes involving assignment

5   photography to -- I can think of one instance of where

6   I was actually hired by a law firm representing two

7   photographers that were married who were getting a

8   divorce, and they had agreed to amicably split their

9   resources equally.

10    And I was hired to value or evaluate both

11   the stock photography business of the wife and the

12   assignment photography business of the husband and to

13   project earnings over a period of time so that they

14   could take those projections and those valuations that

15   I provided and decide who pays whom and how much.

16       Q.    In performing your analysis in this case,

17   did you do a survey of photographers about their

18   licensing practices?

19       A.    No, sir.

20       Q.    Did you do a survey of companies that

21   license and purchase rights from photographers on

22   assignment projects on their licensing practices?

23       A.    No, sir.

24       MR. BEARD:  Objection.  Form.

25

**Gary Elsner**

```
 1   BY MR. WISNIA:

 2        Q.   Did you -- well, let me strike that for a

 3   second.

 4             In all the years you've been in this

 5   business, have you ever seen a situation like this

 6   where post-ICA there's this different shoots and

 7   there's no written contract about the rights to be

 8   used -- the rights under the -- under the images?

 9             MR. BEARD:  Objection.  Calls for

10   speculation.

11             THE WITNESS:  Well, to begin with, in almost

12   every instance I've dealt with relating to assignment

13   photography and licensing, et cetera, there wasn't an

14   ICA, so this post-ICA is really the only period of

15   discussion.

16             And to further answer your question, yes,

17   multiple times I've seen the same sort of licensing

18   invoice documents that are really absent any specific

19   information that would clarify specific rights being

20   conveyed.

21   BY MR. WISNIA:

22        Q.   And in those situations, is there some sort

23   of oral agreement between the parties?

24             MR. BEARD:  Objection.  Calls for

25   speculation.
```

```
 1              THE WITNESS:  You know, that's -- I'm not an

 2    attorney, and I wouldn't know how to answer that

 3    question.  And I -- you know, if I'm engaged to offer

 4    my opinion, it's going to be based, not on intent or

 5    hearsay, but really whatever documentation and factual

 6    evidence or information that can be provided to me.

 7    BY MR. WISNIA:

 8         Q.   So you have at paragraph 51 --

 9         A.   Can I close Exhibit -- Exhibit 6?

10         Q.   Sure.

11         A.   Okay.  I'm back at 51.  I think that's where

12    you directed me.

13         Q.   Yes, sir.  (Quote as read):

14                   There are always exceptions that

15                   would exist to this process, such

16                   as the existing relationship that

17                   L'Heureux maintained with Otter

18                   during the period that the ICA was

19                   in place which, of course, provided

20                   explicit guidelines, parameters,

21                   and responsibilities of the

22                   relationship that would streamline

23                   productions during the terms of the

24                   agreement.  Any such history can

25                   become a baseline understanding for
```

```
 1              future productions serving to

 2              reduce the work needed to arrange,

 3              negotiate, and perform subsequent

 4              productions.

 5         Do you see that?

 6    A.    Yes, sir, I do.

 7    Q.    We've seen through the history of the

 8    relationship between L'Heureux and Otter that the

 9    actual people that were involved in the -- in the

10    dealings, L'Heureux and Oldfield, thought they had a

11    rights-managed arrangement.

12         When they tried to contract it by alerting

13    by Google, they ended up with some sort of hybrid

14    royalty-free/rights managed/subscription deal and then

15    eventually they ended up with the ICA, which is what

16    you call the work-for-hire agreement.

17         So is it fair to say that through the

18    history of the dealings between L'Heureux and Otter,

19    they were all over the place?

20         MR. BEARD:  Objection.  Calls for

21    speculation.  Legal conclusion.

22         THE WITNESS:  Again, I can't speak to intent

23    and what people had in their mind, et cetera.  The

24    documents speak for themselves, and I've already

25    testified as to what I thought about the various
```

```
 1    estimate.
 2        Q.   But, in fact, is his actions consistent with
 3    industry custom or inconsistent with industry custom?
 4            MR. BEARD:  Objection.  Asked and answered.
 5    Vague.
 6            THE WITNESS:  Inconsistent.
 7    BY MR. WISNIA:
 8        Q.   Okay.  Take a look at paragraph 95.
 9        A.   I'm there.
10        Q.   You write, (quote as read):
11                 I find it especially notable that
12                 many of these invoice licenses and
13                 materials are issued directly by
14                 L'Heureux himself, showing that he
15                 was personally familiar with
16                 industry practices reflected in
17                 these documents -- in those
18                 documents.
19            Do you see that?
20        A.   Yes, sir, I do.
21        Q.   And you cite to a series of exhibits,
22    including the ones we just talked about, right?
23        A.   Correct.
24        Q.   So once you looked at these exhibits, in
25    fact, doesn't it show to you that he wasn't really
```

Case 1:20-cv-02251-RBJ-KMT Document 225 Filed 02/23/25 USDC Colorado Page 26 of 31

**Gary Elsner**

1   familiar with industry practices because he's not

2   following what you understand to be industry

3   practices?

4           MR. BEARD:  Objection.  Misstates.  Vague.

5           THE WITNESS:  What is stated in section 95

6   states that he's personally familiar.  Personally,

7   meaning himself.  Familiar, meaning he's come to see

8   it.

9           It doesn't mean that he's using it properly,

10  but he's conceptually familiar with the fact that you

11  have to have some restrictions if you're going to

12  issue a license invoice that is not a total buyout.

13  And that was the intent of my statement there.

14  BY MR. WISNIA:

15      Q.   Take a look at paragraph 97 of your report.

16      A.   I'm there.

17      Q.   You write, (quote as read):

18              From these observations, it is my

19              opinion that L'Heureux's invoice

20              licensing practices during the

21              period of the asserted productions

22              show his ability to conform to

23              industry practice and that his

24              failure to include a limit on the

25              scope of duration of use for the

```
 1         A.    No.
 2         Q.    And did Otter have the -- what rights did
 3    Otter have to do with the images that resulted?
 4         A.    Under the ICA?
 5         Q.    Uh-huh.
 6               MR. WISNIA:  Objection.  Vague.
 7               THE WITNESS:  They had --
 8               MR. WISNIA:  Leading.
 9               THE WITNESS:  They had unfettered right of
10    use on an exclusive basis.
11    BY MR. BEARD:
12         Q.    You gave some testimony about -- sorry.
13    ██████████████████████████████████████████
      █████████████████████████████████████
      ███████████████████████████████
      ██████████████████████████████████████████████████
17    license, that the accused productions would be
18    non-exclusive or exclusive?
19               MR. WISNIA:  Objection.  Leading.
20               THE WITNESS:  Non-exclusive.
21    BY MR. BEARD:
22         Q.    Are you aware of any facts from after the
23    termination of the ICA that indicate Otter required
24    exclusivity for the images that resulted?
25               MR. WISNIA:  Say that again --
```

```
 1              THE WITNESS:  I did not.

 2              MR. WISNIA:  Sorry.  I just didn't hear it.

 3    Could you repeat it.

 4    BY MR. BEARD:

 5         Q.   No, I'll repeat.  Sorry.  My video angle is

 6    weird because I'm leaning over awkwardly.

 7              Are you aware of any facts from after the

 8    termination of the ICA that indicate Otter required

 9    exclusivity from the images of those productions?

10              MR. WISNIA:  Objection.  Foundation.

11    Leading.

12              THE WITNESS:  I am not aware of any facts.

13    BY MR. BEARD:

14         Q.   Were you asked questions about hypothetical

15    negotiations after the ICA was terminated?

16         A.   Yes, sir.

17         Q.   In your opinion, based on the facts

18    available for the time after the ICA, would the

19    non-exclusive licensing option from Getty be

20    comparable to Otter's actual use?

21              MR. WISNIA:  Objection.  Outside the scope

22    of his report.  Leading.  Foundation.

23              MR. BEARD:  I'm happy to direct him to a

24    paragraph, if that's helpful.

25              THE WITNESS:  It would be my opinion that
```

```
 1   BY MR. BEARD:
 2        Q.   Okay.  Sorry.  Reframe that.
 3             Were you asked this morning about Capture
 4   Eleven's interrogatory response ███████████?
 5        A.   Yes, I was.
 6        Q.   And were you asked about your comment at the
 7   bottom of paragraph 99 stating, "The invoice therefore
 8   does not support any such limitation on use of the
 9   resulting images"?
10        A.   That is correct.
11        Q.   Would it be up to the jury to determine
12   whether the assertions of L'Heureux about clear
13   limitations, correct?
14             MR. WISNIA:  Objection.  Outside the scope.
15   Leading.
16             THE WITNESS:  I'm not an attorney and,
17   obviously, that would be something for the jury or the
18   Court to decide.
19   BY MR. BEARD:
20        Q.   Is it your opinion that the invoice itself
21   does not support such limitation?
22        A.   Yes.  It is my opinion that the end license
23   invoice does not support that opinion.
24        Q.   Other than the discussion on the ██████████
     ████████████████████████, do Mr. L'Heureux's practices
```

```
 1              MR. BEARD:  What's the normal turnaround for
 2    the standard?
 3              THE REPORTER:  Ten business days.
 4              MR. BEARD:  I might need it before then, but
 5    I'll have my assistant reach out, if that's okay.
 6                   (Whereupon, the deposition
 7                   adjourned at 5:00 p.m.)
 8                        --oOo--
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Gary Elsner

The Capture Eleven Group vs.
Otter Products, LLC

```
 1              CERTIFICATE OF REPORTER

 2          I, RENEE COMBS QUINBY, a Certified Shorthand

 3     Reporter, hereby certify that the witness in the

 4     foregoing deposition was by me duly sworn to tell the

 5     truth, the whole truth, and nothing but the truth in

 6     the within-entitled cause;

 7              That said deposition was taken in shorthand

 8     by me, a disinterested person, at the time and place

 9     therein stated, and that the testimony of the said

10     witness was thereafter reduced to typewriting, by

11     computer, under my direction and supervision;

12              I further certify that I am not of counsel

13     or attorney for either or any of the parties to the

14     said deposition, nor in any way interested in the

15     event of this cause, and that I am not related to any

16     of the parties thereto.

17              DATED: 02/16/2023

18

19

20              _____

21              RENEE COMBS QUINBY, CRR, RDR, CSR 11867

22

23

24

25
```